322 F.Supp. 1100 (1971)
RESIDENT PARTICIPATION OF DENVER, INCORPORATED, a Colorado non-profit corporation; N.O.D., Incorporated, a Colorado non-profit corporation, Plaintiffs,
v.
John LOVE, individually and as Governor of the State of Colorado, Duke W. Dunbar, individually and as Attorney General of the State of Colorado, James D. McKevitt, individually and as District Attorney for the City and County of Denver, Colorado, the Denver Publishing Company, a Colorado corporation, the Denver Post, Inc., a Colorado corporation, Defendants.
Civ. A. No. C-2548.
United States District Court, D. Colorado.
February 8, 1971.
*1101 Howard I. Rosenberg, James H. Seckinger, David R. Lass, Allan S. Reiver and Thomas E. Frank, and James E. Rode and Joseph E. Meyer, Denver, Colo., for plaintiffs.
Eugene C. Cavaliere, Asst. Atty. Gen., Denver, Colo., for John A. Love and Duke W. Dunbar.
Thomas P. Casey, Deputy Dist. Atty., Gregory A. Mueller, Asst. Dist. Atty., and Jarvis W. Seccombe, Chief Deputy Dist. Atty., Denver, Colo., for James D. McKevitt.
Winner, Berge, Martin & Clark by Warren O. Martin, Denver, Colo., for The Denver Publishing Co.
Van Cise, Freeman, Tooley & McLearn by Edwin P. Van Cise, Denver, Colo., for The Denver Post, Inc.
Before HILL, Circuit Judge, ARRAJ and DOYLE, District Judges.

MEMORANDUM OPINION AND ORDER
ARRAJ, Chief Judge.
The principal question before us is whether a newspaper's refusal to print an advertisement violates the first amendment to the United States Constitution.
About six months ago plaintiffs began a campaign to prevent construction in Denver of a plant for cutting up the carcasses of animals, an operation which plaintiffs fear would be accompanied by such "stench and filth" as to make living within reach of the plant extremely unpleasant and perhaps hazardous to health. Because 51% of Pepcol, Inc., which planned to build the rendering plant, is owned by Beatrice Foods, Inc., plaintiffs decided to oppose the project by asking Denver residents to boycott Beatrice Foods. To this end they submitted advertisements to the Denver Post and Rocky Mountain News, both newspapers of general circulation in the Denver area. The advertisements described the proposed rendering plant in unsympathetic language and asked readers not to buy products bearing Meadow Gold or Zooper Dooper labels. Both newspapers refused to print the advertisements on the ground, plaintiffs allege, that to do so would violate a Colorado statute making unlawful the printing or circulation of a boycott notice. Colo.Rev.Stat.Ann. § 80-11-12 (1963). In response to these rejections, plaintiffs drew up two more advertisements which did not call for a boycott but did list Beatrice products and asked readers to clip out, sign and mail certain letters to state and city officials. Both newspapers refused to print the revised advertisements.
Plaintiffs next prepared and printed boycott leaflets for distribution in downtown Denver, but, because they were concerned about possible criminal prosecution for violating the Colorado boycott statute, they sought opinions from the Colorado Attorney General and the Denver District Attorney as to whether these officials regarded 80-11-12 as constitutional and would enforce it. Deputy Attorney General John P. Moore replied that the office's statutory authority to render advisory opinions is limited to certain state officials. He added, however, that the office regards itself as bound by the Colorado Supreme Court's statement in People v. Leddy, 53 Colo. 109, 111, 123 P. 824, 825 (1912), that:
As every enrolled bill, signed by the proper officers and lodged with the Secretary of State, however repugnant to the Constitution, has the appearance, semblance, and force of law, the general rule is that public officials *1102 shall obey its terms until some one, whose rights it invades, complains, and calls in the aid of the judicial power to pronounce it void as to him, his property, or his rights.
Then District Attorney James D. McKevitt responded by stating that the district attorney is duty bound to enforce the laws of the state.
Rather than risk criminal prosecution for distributing leaflets, plaintiffs brought this action seeking a declaratory judgment and temporary and permanent injunction against enforcement of the statute on the grounds that the statute abridges first amendment freedom of speech, is unconstitutionally vague and is preempted by federal labor law. Plaintiffs seek the same relief, on first amendment grounds, from the newspapers' refusal to publish plaintiffs' advertisements. District Judge Alfred A. Arraj, to whom the case was first assigned, granted a temporary order restraining defendant law enforcement officials from enforcing the boycott statute, pending determination of plaintiffs' request for a temporary injunction. Judge Arraj declined to order defendant newspapers to print plaintiffs' advertisements. A three-judge court was convened pursuant to 28 U.S.C. §§ 2281, -84 (1964) and thereafter defendants filed motions to dismiss which are the subject of this opinion. Defendant newspapers both maintain that the complaint fails to state a cause of action against them because the first and fourteenth amendments prohibit only official abridgements of free speech, not merely private ones. Defendants attorney general and district attorney contend that the court lacks jurisdiction of the subject matter of this action because there is no case or controversy within the meaning of Article III of the Constitution and because plaintiffs have failed to join an indispensable party. For the reasons set forth below, we have concluded that the motions of defendant newspapers should be granted and the motions of defendant law enforcement officials denied.

I.
The first amendment prohibits Congress from making any law which abridges freedom of speech or of the press, and these limitations upon the reach of the federal government have been made applicable to the states through the fourteenth amendment. Plaintiffs concede, therefore, that to uphold this cause of action as to defendant newspapers we must find that their refusals to print plaintiffs' advertisements can be considered a kind of official behavior. The Supreme Court has held that state action may include not only government conduct but also private conduct "so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1965). Plaintiffs argue that state action is present in this case because defendant newspapers enjoy a special relationship with the State of Colorado and City of Denver which involves those governments in the newspaper business and because the papers "enjoy monopoly control in an area of vital public concern."
Plaintiffs gather support for their theory that the state and city are involved in the newspaper business from those sections of the Colorado Revised Statutes which require that legal notices be published in newspapers of general circulation, Colo.Rev.Stat.Ann. §§ 49-10-3, -8-1, -22-5, -22-11 (1963) and which exempt editors and reporters from jury service, id. § 78-1-3, and those sections of the Denver Municipal Code which permit newspapers to place vending machines on public property, including sidewalks. Denver Rev. Municipal Code §§ 339G, 334.1-2. We doubt that these statutes and regulations can be read as putting the city and state into the newspaper business. Clearly the purpose of requiring that legal notices be published in newspapers of general circulation is not to benefit the papers but to insure that the public is *1103 aware of matters of legal importance. The numerous exemptions from jury service provided in 78-1-3 apparently express the Colorado legislature's judgment concerning the public importance of certain occupations and the hardship which jury service might cause to certain classes of persons. Thus, in addition to editors and reporters, the statute exempts state and county officers, judges and clerks of court, justices of the peace, constables, attorneys, officers of railroad, telephone and telegraph companies and persons sixty years of age or older. The purpose of exempting persons in these occupations is surely not to benefit either government or business but to benefit the public which relies upon their services. The only exemption clearly intended to benefit those relieved from jury duty is the exemption for persons sixty or older, and it would be somewhat farfetched to argue that this benefit establishes a special relationship between the State of Colorado and these citizens such that the conduct of the latter could be considered state action. While it is no doubt true that the Denver ordinance permitting newspapers to place vending machines on public property is a benefit, we doubt that such was the city's intention. The most plausible purpose of the ordinance, we think, is to serve the public's interest in obtaining newspapers. Cf. Chicago Joint Board, Amalgamated Clothing Workers of America, A.F.L.-C.I.O. v. Chicago Tribune Company, 435 F.2d 470 (7th Cir. 1970). In any event, we would find it difficult to conclude that the right of the Ridgefield Press, a Connecticut weekly newspaper, to place vending machines on the sidewalks of Denver converts the conduct of that faraway journal into Colorado state action.
Even granting that the above-mentioned measures show a degree of official involvement in newspapering, neither the cases plaintiffs have cited, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc., 302 F.Supp. 459 (D.D.C. 1969), nor any we have discovered remotely suggests that these measures are sufficient to justify labeling the newspapers' conduct as state action. In Burton, for example, the Supreme Court held that a private restaurant owner's refusal to serve Negroes was, in effect, state discrimination because of the extraordinary relationship between the restaurateur and the City of Wilmington, Delaware. The building which housed the restaurant had been constructed with public funds for a public purpose, as had the parking lot on which the building was located, and the parking building had been leased to the restaurant operator by a city agency. The court noted that the "peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits," that the "restaurant is operated as an integral part of a public building devoted to a public parking service," and that "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a government agency." Burton, supra, 365 U.S. at 724, 81 S.Ct. at 861. Plaintiffs in this case show no such connection between the State of Colorado or City of Denver and defendant newspapers. These governments do not own the newspapers, the buildings which house them or the machinery which produces them. Except for revenue obtained from taxation, the presence of defendants is not financially advantageous to these governments. More important, while the Wilmington agency could have dictated the terms of a restaurant lease, neither Colorado agency has the power to dictate what a newspaper may print. Plaintiffs argue that the financial advantage which accrues to newspapers from their legal notice and vending machine business is, without more, sufficient to establish some special relationship. This amounts to arguing that any class of persons or businesses upon whom a financial advantage is conferred thereby becomes an organ *1104 of the state, and it can make no difference whether the state's selection of a particular class is rational enough to withstand an attack based upon due process or equal protection. Since law itself can be viewed as a system of benefits, this argument comes near to abolishing any distinction between official and private conduct.
The Marjorie Webster case does not support plaintiffs' theory. Although the trial court had ruled that the conduct of a private education association in denying accreditation to a proprietary college was state action, the Court of Appeals for the District of Columbia found it unnecessary to decide that question and reversed the trial court, concluding that appellee had failed to meet its burden of showing that the action was unreasonable. 432 F.2d 650 (D.C.Cir. 1970). The appellate court did not even discuss the state action problem and we are therefore unable to attribute to it any view whatever on the matter now before us.
Plaintiffs' alternative contention, while considerably less precise, better expresses what the complaint against defendant newspapers is actually about. Plaintiffs argue that newspapers ought to have a duty to provide reasonable space for citizens to express their views because in Denver, as elsewhere, newspapers exercise "monopoly control in an area of vital public concern." This does not mean, we take it, that defendants are monopolies within the meaning of the antitrust laws, since no violation of those laws is alleged, but rather that the soapbox has yielded to radio and the political pamphlet to the newspaper. Barron, Access to the PressA New First Amendment Right, 80 Harv. L.Rev. 1641, 1643 (1967). However, the fact that defendants control a method of reaching a large audience and that this is a matter of importance to us all does not mean defendants' conduct should be considered government conduct and the cases which plaintiffs cite do not support such a proposition. Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L. Ed. 265 (1946). In Marsh the Supreme Court ruled that a state could not impose criminal punishment upon a person who distributes religious literature on the sidewalk of a company-owned town, contrary to regulations of the town's management. The regulations were held to be impermissible, state action because the town management performed a function of a governmental character and the business block on which appellant had attempted to distribute literature was open to the public in the area and to people passing through. 326 U.S. at 508, 66 S.Ct. 276. In the Logan Valley Plaza case, the Supreme Court relied upon Marsh in holding that a state could not apply its trespass laws to prohibit peaceful picketing in a private shopping center which was open to the public and functioned as a business district. Neither of these cases even remotely resembles the case before us. Plaintiffs do not argue, nor do we believe they could, that defendant newspapers hold their columns open to the public or perform a function of a governmental character. Terry v. Adams, supra, though difficult to analyze, is equally inapposite. At issue there was the conduct of the Jaybird Party, a Texas political organization which excluded Negroes from its primaries on racial grounds. With few exceptions Jaybird candidates ran unopposed in county Democratic primaries and general elections. The court held that for a state to permit the use of a device which produces the equivalent of a prohibited election violates the fifteenth amendment, and it found that the Jaybird primary had "become an integral part, indeed the only effective part, of the elective process that determines who shall rule and govern in the county." 345 U. S. at 469, 73 S.Ct. at 813. While the case can be read as equating, in certain circumstances, state action with inaction, the Supreme Court relied heavily *1105 upon the fact that a state is ultimately responsible for its elections and cannot, therefore, in an area replete with legislation, become a silent accomplice in a scheme to undo the fifteenth amendment. Clearly defendant newspapers are not engaged in an enterprise which is ultimately the responsibility of government to regulate or carry out. Nor can we discover in any legislative inaction evidence which suggests that Colorado has permitted newspapers to emasculate the first amendment, for while it is obvious that the fifteenth amendment prohibits racial discrimination in voting, it is not equally clear, even assuming state action, that the first amendment prohibits newspapers from refusing advertisements, at least so long as the refusal has a reasonable basis. Whatever may be the scope of the court's holding in Terry v. Adams, we find it a difficult and puzzling point of departure for an analysis of the present case.
Of course, state action, like government itself, is not a fixed notion, and we do not mean to suggest that enquiry comes to an end merely because the cases which plaintiffs cite do not, in our view, support their theory. However, the above-mentioned cases do indicate that, where private conduct is concerned, there must be some justification for concluding that the private party serves as an alter ego for government, either because officialdom has in some important way become involved with the private party or because the latter performs a function of a governmental nature. Whatever may be the reach of these imprecise ideas, we find them peculiarly inappropriate for describing the relationship between defendant newspapers and the State of Colorado and City of Denver. Plaintiffs have made no allegations which would suggest a marriage among these parties, and the historic function of newspapers, like the pamphlets of a prior day, has been to oppose government, to be its critic not its accomplice. While few newspapers may live up to that ideal, plaintiffs do not allege that either the Rocky Mountain News or Denver Post is the lackey of a city or state administration or in any other way in the grip of official power.
We are aware that lack of access to those media which reach large audiences has, some believe, given birth to a frustration which compels otherwise peaceful citizens to engage in violence to get their views to the nation. A cause of this frustration, one critic maintains, is that, although the courts have been vigorous in protecting free speech, they have been indifferent to creating opportunities for expression. Barron, Access to the PressA New First Amendment Right, 80 Harv.L.Rev. 1641 (1967). We note, however, that while Professor Barron spends considerable space exploring a statutory solution to this problem, he devotes much less attention to constitutional arguments and but one paragraph to the problem of state action, which we find insurmountable. Professor Barron simply concludes, without noticeable explanation, that newspapers can be subjected to the "constitutional restrictions which quasi-public status invites." Id. at 1669. As desirable as this result might be, we are unable in good faith to reach it. Our conclusion that the newspapers' conduct cannot be considered state action agrees with the conclusion arrived at by the Seventh Circuit Court of Appeals in Chicago Joint Board, Amalgamated Clothing Workers of America, A.F.L.-C.I.O. v. Chicago Tribune Company, 435 F.2d 470 (7th Cir. 1970), the only other case we have discovered which raises issues identical to those presented in this litigation.

II.
Defendants attorney general and district attorney seek dismissal of this action on the ground that it presents no case or controversy within the meaning of Article III of the Constitution. The district attorney maintains that plaintiffs lack standing to bring the action because the Colorado boycott statute does not apply to plaintiffs, and, even if it does apply, the case is not ripe for adjudication. *1106 It is also urged that plaintiffs lack standing to raise a question of federal preemption.
The district attorney argues that Colo.Rev.Stat.Ann. § 80-11-12 (1963) does not apply to plaintiffs because neither of them is an employee, employer, or labor organization subject to chapter 80 of the revised statutes, which concerns labor relations. Section 80-11-12 provides as follows:
It shall be unlawful to print or circulate any notice of boycott, boycott card, sticker, banner, sign or dodger, publishing or declaring that a boycott or ban exists, or has existed or is contemplated against any person, firm or corporation doing a lawful business, or publish the name of any judicial officer or other public officer upon any notice of boycott, boycott card, sticker, banner, sign or other similar list, because of any unlawful act or decision of such official.
Despite the rather plain language of this section, defendant contends that it must be read as part of the chapter on labor relations and confined in its application to labor controversies. Defendant cites no authority for this interpretation and we can find no support for it in chapter 80 itself. On the contrary, the Colorado legislature clearly indicates that the boycott statute applies to everyone. Section 80-11-15 makes it a misdemeanor for any "person, firm or corporation" to violate 80-11-12. In addition, the legislature makes plain which sections in chapter 80 are limited in their application to particular classes of persons. Thus, section 80-11-10 makes it unlawful for any "corporation, company or individual" to blacklist an employee; section 80-11-14 prohibits an "employer" from maintaining a blacklist; section 80-11-2 forbids any "individual, company or corporation or any member of any firm or agent, officer or employee of any company or corporation" from interfering with lawful labor organization. This enumeration, which could be extended for pages, indicates that the legislature knew how to express the limitation which defendant claims it failed to state in 80-11-12. It therefore seems abundantly clear to us that the boycott statute applies to all persons, including plaintiffs.
Defendant's "ripeness" argument is somewhat more complicated. He contends that neither the attorney general nor any district attorney may prosecute a chapter 80 violation except on request of the Colorado Industrial Commission or its director. Colo.Rev.Stat.Ann. § 80-1-47 (Supp.1969). Because neither has requested that action be taken, plaintiffs have not been threatened with prosecution for violating the boycott statute, and, without an immediate threat of enforcement and thus of irreparable injury, plaintiffs' declaratory judgment and injunction action lacks the "exigent adversity" which Article III requires. Defendant's argument means, in effect, that to question the constitutionality of the statute plaintiffs must first disobey it and run a risk of criminal prosecution. Defendant attorney general made an identical argument in a recent three-judge case in this district. Doe v. Dunbar, 320 F.Supp. 1297 (D. Colo. 1970). There the court analyzed the case and controversy requirement as follows:
The Supreme Court has not, to our knowledge, ever adopted such a harsh and absolute requirement [that plaintiffs must first disobey the law]. In fact, the court has held by necessary implication that it is not deprived of jurisdiction on direct appeal merely because the plaintiff in a declaratory judgment action has not disobeyed the challenged statute or has not been directly threatened with prosecution. Epperson v. Arkansas, 393 U.S. 97, 101-102, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The scope of the court's holding in Epperson is difficult to ascertain because the majority does not discuss the case or controversy problem. Nevertheless, the fact that the court decided the case on its merits can mean no less than that a specific and immediate threat of enforcement is not *1107 a constitutional requirement in a declaratory judgment action.
While the many Supreme Court decisions which both defendants and plaintiffs have cited may not be entirely reconcilable, we can discern several considerations which the court has taken into account in judging whether there exists a case or controversy within the meaning of Article III. While there need not be a threat of immediate prosecution, it should nevertheless not appear that the state maintains a policy of non-prosecution which might render any decision unnecessary and even inappropriate. Compare Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), with Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958); but see Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Furthermore, there should not be any substantial question concerning the scope or meaning of the statute in question or the manner of its enforcement, lest a decision prior to prosecution for specific acts take on an abstract or hypothetical character. United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Finally the Supreme Court has taken into account the possible harm which could befall a plaintiff forced to run the risk of prosecution in order to state his claim. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).
Except for his contention that the boycott statute does not apply to plaintiffs, defendant does not argue that the scope or meaning of the statute is in doubt. While no use of language can be entirely free from ambiguity, we have little difficulty agreeing with plaintiffs that the statute's prohibition against printing or circulating boycott notices would apply to their proposed conduct. Consideration of hardship also favors plaintiffs. If forced to disobey the statute in order to assert their claim, plaintiffs would risk conviction of a misdemeanor with a maximum penalty of 60 days in jail and a $250 fine. Colo.Rev. Stat.Ann. § 80-11-15 (1963). Whether Colorado law enforcement officers and the Colorado Industrial Commission do not, as a matter of policy, enforce the boycott statute is a more troublesome question. We have found no recorded prosecutions. On the other hand, though the final decision may not be theirs, the offices of both the Colorado Attorney General and the Denver District Attorney have indicated a willingness to prosecute. In these circumstances we believe the proper course is to retain jurisdiction. As we read Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), a federal court is deprived of jurisdiction only when it can make a clear finding that the state pursues a policy of non-enforcement, and we are unable with certainty to make such a finding here. Furthermore, "the Supreme Court's subsequent decision in Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), in which the court struck down a statute with no record of enforcement, casts some doubt upon the present vitality of Poe v. Ullman." Doe v. Dunbar, 320 F. Supp. 1297 (D.Colo. 1970).
We agree with defendant district attorney, however, that plaintiffs lack standing to assert that the National Labor Relations Act preempts the Colorado boycott statute. Plaintiffs have not shown that they are connected in any way with labor or management and have therefore failed to establish "a logical nexus between the status asserted and the claim sought to be adjudicated." Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

III.
The district attorney also argues that this action should be dismissed pursuant to Rule 19 of the Federal Rules of Civil Procedure for failure to join the Colorado Industrial Commission and its director as parties defendant. Since the commission and its director are subject to service of process in Colorado and *1108 their joinder would not defeat our jurisdiction, the question is whether either should be joined for the reasons expressed in 19(a). Defendant maintains that complete relief cannot be granted without these parties because they could request boycott statute prosecutions on the part of district attorneys who are not parties to this action. We disagree. Plaintiffs wish to conduct a boycott in Denver. Therefore, an injunction against enforcement of the statute by the attorney general or Denver District Attorney will provide complete relief.
For the foregoing reasons, it is ORDERED as follows:
(1) That the motions of the Denver Publishing Company and the Denver Post to dismiss the complaint against them be and the same hereby are granted;
(2) That the motions of the Colorado Attorney General and the Denver District Attorney to dismiss the complaint against them be and the same hereby are denied;
(3) That the motions of the Colorado Attorney General and Denver District Attorney to dismiss those portions of the complaint which raise the issue of federal preemption be and the same hereby are granted.