The **ASSOCIATES & ALDRICH COM-PANY, Inc.,** a California corpo-ration, Plaintiff-Appellant,

v.

The **TIMES MIRROR COMPANY,** a California corporation, Defendant-Appellee.

No. 24453.

United States Court of Appeals, Ninth Circuit.

March 30, 1971.

Stanley Fleishman (argued), Holly-wood, Cal., for appellant.

Robert S. Warren (argued), Don J. Belcher, of Robert C. Lobdell, Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellee.

Before KOELSCH, DUNIWAY and WRIGHT, Circuit Judges.

WRIGHT, *Circuit Judge*:

This appeal presents the question: May a federal court compel the publisher of a daily newspaper to accept and print advertising in the exact form submitted? The district court, granting a motion to dismiss, answered the question in the negative. We affirm.

Appellant, a motion picture producer, sought to enjoin the appellee, publisher of the *Los Angeles Times*, from screening, censoring or otherwise changing appellant's proffered advertising copy. Invoking the jurisdiction of the district court under 28 U.S.C. §§ 1331, 1343(3) and 42 U.S.C. § 1983, it sought particu-

larly to restrain appellee from altering its advertisements for the motion picture, "The Killing of Sister George."

It was alleged that the film had been widely distributed and reviewed, was of social importance, not obscene or otherwise unlawful and was a form of communication protected by the free speech and press guarantees of the First Amendment and the due process provisions of the Fourteenth Amendment.

Further, it was said that the *Times,* with large advertising revenues, had "attained a substantial monopoly" in southern California. In Los Angeles and four surrounding counties, the *Times* accounted for 80% of all morning daily circulation, as of 1964. By virtue of its controlling position in the newspaper business in southern California, it was alleged, the *Times* occupied a "quasi-public position" equivalent to that of a public service business and was therefore "subject to control for the public good."

In its Complaint for Injunction, appellant further asserted that newspaper advertising is essential to the successful promotion of motion pictures; and that interference with the right to advertise abridges the "right of the public to know."

Appellant submitted to the *Times* an advertisement similar to those used in other cities, in the press and on billboards. The drawings and written material were said to be part of the artistic whole and the hallmark of the motion picture.

Following its own "Screening Code," and exercising its judgment, the *Times* altered the ad copy. The drawing of a female figure was slightly altered and a reference to deviate sexual conduct was eliminated. As altered, the advertisement was printed and paid for.

Appellant takes exception to the *Times'* Screening Code, as vague, uncertain and arbitrary and, in effect, a form of censorship. The code includes specific sex-

oriented words to avoid and gives guidelines to the advertising staff on everything from "bust measurements" to "vulgar display of anatomy."

Alleging substantial and irreparable damage, appellant prayed for:

1. An injunction against the enforcement of the screening code or any form of censorship of motion picture advertising;

2. An injunction against refusing to accept advertisements not obscene or otherwise unlawful; and

3. An injunction against refusing the publication of appellant's advertising copy for the film "The Killing of Sister George," without censorship.

Respondent moved to dismiss the complaint. Its position in the district court and here is that the decree sought would violate the right of freedom of the press; that a newspaper publisher may not be forced to publish advertisements which, in its judgment, are in poor taste or offensive to its readers; and, in any event, the *Times* is not a governmental agency, subject to regulation.

■■ The assertion of state action is the basis of the claim of violations of constitutional rights. The *Times'* "semi-monopoly and quasi-public position" are said to be state action. The prohibitions of the Fourteenth Amendment apply only to state action and not to conduct in the private sector. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Violation of such constitutional rights is actionable under federal law only when accomplished by one who is "clothed with the authority of the state and * * * purporting to act thereunder." Marshall v. Sawyer, 301 F.2d 639, 646 (9th Cir. 1962). Other cases on this subject are analyzed in the recent opinion of the Seventh Circuit in Chicago Joint Board, Amalgamated Clothing Workers of America, AFL–CIO, v. Chicago Tribune Co., 435 F.2d 470 (7th Cir., 1970).[1]

1. *See also,* Resident Participation of Denver, Inc. v. Love, 322 F.Supp. 1100, (D. Colo., 1971), decided by a three-judge panel after oral argument herein. An action against two Denver daily newspapers to force the publication of advertising of

In *Chicago Tribune*, a union sought injunctive relief to compel several Chicago daily newspapers to publish an editorial advertisement tendered by the union and damages for defendant's refusal to publish. The district court granted summary judgment for the defendants, rejected the argument that there was state involvement in the operation of defendants' newspapers, and concluded that absence of state action deprived the court of jurisdiction. In its memorandum opinion the district court there said:

"Rather than regarded as an extension of the state exercising delegated powers of a governmental nature, the press has long and consistently been recognized as an independent check on governmental power.

"In sum, the function of the press from the days the Constitution was written to the present time has never been conceived as anything but a private enterprise, free and independent of government control and supervision. Rather than state power and participation pervading the operation of the press, the news media and the government have had a history of disassociation." *Chicago Tribune*, at 474.

█ Even if state action were present, as in an official publication of a state-supported university, there is still the freedom to exercise subjective editorial discretion in rejecting a proffered article.

"The right to freedom of speech does not open every avenue to one who desires to use a particular outlet for expression. On the contrary, each particular avenue for expression presents its own peculiar problems. * * *

"On the contrary, the acceptance or rejection of articles submitted for publication in a law school law review necessarily involves the exercise of editorial judgment and this is in no wise

lessened by the fact that the law review is supported, at least in part by the State." Avins v. Rutgers, State University of New Jersey, 385 F.2d 151, 153–154 (3d Cir. 1967), cert. den. 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968).

Appellant has not convinced us that the courts or any other governmental agency should dictate the contents of a newspaper.[2]

There is no difference between compelling publication of material that the newspaper wishes not to print and prohibiting a newspaper from printing news or other material. *See* Avins v. Rutgers, State University of New Jersey, *supra*.

Appellant strongly urges that this case is governed by Red Lion Broadcasting Co. v. Federal Communications Comm., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). There the Court considered the effect and constitutionality of the "fairness doctrine," a long standing requirement of the F.C.C. that discussion of public issues be presented on broadcast stations and that each side of such issues be given fair coverage.

The broadcasters in *Red Lion* challenged the "fairness doctrine," alleging that it abridged their freedom of speech and press. It was contended that the First Amendment protected them in the use of their broadcast frequencies as they might choose and allowed them to exclude others from the use of such frequencies.

The Court, in upholding the constitutionality of legislatively authorized F.C.C. regulations respecting the "fairness doctrine," discussed the matter as follows:

"Although broadcasting is clearly a medium affected by a First Amendment interest, United States v. Paramount Pictures, Inc., 334 U.S. 131, 166,

---

a boycott of a rendering plant was dismissed.

2. This is not to say that a court may not, in the interest of assuring a fair trial, exclude the news media from a courtroom. *See* Information Manual for the Bar,

News Media, Law Enforcement Officials and Courts, American Bar Association, 1969. Section 3.1 permits exclusion of the press from pretrial hearings. Section 3.5 allows courts to exclude the news media from portions of jury trials taking place in the absence of the jury.

**136**

68 S.Ct. 915, 92 L.Ed. 1260 (1948), *differences in the characteristics of new media justify differences in the First Amendment standards applied to them.* Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 96 L.Ed. 1098 (1952)." *Red Lion, supra,* at 386–387, 89 S.Ct. at 1805. (Emphasis added.)

"Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Red Lion, supra,* at 388, 89 S.Ct. at 1806.

"In view of the scarcity of broadcast frequencies, *the Government's role in allocating those frequencies,* and the legitimate claims of those unable without governmental assistance to gain access to those frequencies for expression of their views, we hold the regulations and ruling at issue here are both authorized by statute and constitutional." *Red Lion, supra,* at 400–401, 89 S.Ct. at 1812. (Emphasis added.)

Unlike broadcasting, the publication of a newspaper is not a government conferred privilege. As we have said, the press and the government have had a history of disassociation.

We can find nothing in the United States Constitution, any federal statute, or any controlling precedent that allows us to compel a private newspaper to publish advertisements without editorial control of their content merely because such advertisements are not legally obscene or unlawful.

■ In evaluating appellant's claim we note that its commercial advertisement was printed by the appellee, save for the deletion of items not essential to appellant's sales message and not altering the fundamental characteristics of appel-

lant's presentation. This type of commercial exploitation is subject to less protection than other types of speech. Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).[3]

Affirmed.

---

3. Invoking the doctrine of pendent jurisdiction appellant argues, in effect, that the asserted right would be recognized under California law and that the federal court should thus not have dismissed the action. It would be improper to consider the argument for no such contention was made below.