**Michael SINN, an individual, and Pam Pearn, an individual, Plaintiffs,**

v.

**The DAILY NEBRASKAN, a newspaper; et al., Defendants.**

**No. CV85-L-556.**

United States District Court, D. Nebraska.

June 13, 1986.

Jerry L. Soucie, Lincoln, Neb., for plaintiffs.

John Wiltse, Asst. Gen. Counsel, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The plaintiffs allege that the refusal of the *Daily Nebraskan,* the campus newspaper of the University of Nebraska-Lincoln (UN–L), to print the sexual orientation of each in a roommate advertisement is a violation of the First and Fourteenth Amendments to the United States Constitution. At issue is the individual's desire to freely express his or her sexual orientation in the context of a roommate advertisement and the decision of the newspaper's editors, supported by a Publications Committee, not to print a proffered advertisement in its submitted form. The plaintiffs seek declaratory and injunctive relief.

## I. Factual Background

The testimonial evidence indicates that Pam Pearn attempted to place an advertisement seeking a lesbian roommate in the *Daily Nebraskan* in approximately September, 1984. The student employee at the front desk hesitated in accepting the advertisement and informed Pearn that she would need to check with the editor. Dan Shattil, the *Daily Nebraskan* general manager, acted as a "go-between" for the editor-in-chief and Pearn. The editor made or authorized the decision and it was Shattil who informed Pearn that the advertisement would not be published because it would subject Pearn to the "risk of harassment".

In September, 1984, there was no written policy which specifically barred Pearn's advertisement. However, there was an articulated policy barring objectionable advertising. Shattil testified that although the words gay or lesbian are not inherently offensive, the use of the words in a particular context may be objectionable. The evidence does not suggest that the decision was made because the editors found the expression of a gay or lesbian orientation abhorrent. The *Daily Nebraskan* published announcements of gay and lesbian meetings and "gay student month" activities, Plaintiff's Exhibit # 4, and articles concerning the controversy over the *Daily Nebraskan* denial of the plaintiff's advertisements, Plaintiff's Exhibit # 5.

The business affairs of the *Daily Nebraskan* are governed by the Publications Committee. The Committee approves all major decisions concerning budget, income, expenditures, and policy. The Committee also oversees the newspaper's compliance with the code of ethics for student publications as established in the *Guidelines For The Student Press.* The Publications Committee is comprised of nine members: five UN–L students; two staff representatives; and two newspaper professionals from outside the University. The students are nominated by the Associated Students of the University of Nebraska (ASUN) and appointed by the Chancellor. The staff representatives are nominated by the UN–L Faculty Senate and appointed by the UN–L Chancellor. Student members serve staggered one-year terms. The UN–L staff representatives and newspaper professionals serve staggered three-year terms. A member may be removed by a two-thirds majority of the entire committee. Removal occurs only for just cause after notice and a due process hearing. Plaintiff's Exhibit # 3. The Committee members serve without pay. Filing # 20.

The Publications Committee met to discuss the inclusion of self descriptions in Daily Nebraskan advertisements. Pearn and other gays and lesbians were present to voice their support of self descriptions in roommate advertisements. By this time, Pearn testified, she no longer intended to phrase the advertisement in terms of seeking a lesbian roommate; rather, she intended only to describe herself as a lesbian seeking a roommate.

On December 4, 1984, the Publications Committee voted to amend the existing policy by adding "sexual orientation" to the list of characteristics protected from dis-

crimination in advertising. Defendant's Exhibit # 102. The policy was interpreted by the Committee to prohibit all advertisements indicating the advertiser's sexual preference. Filing # 4. The purpose in adopting the revised policy was not to punish or censor the expression of homosexual orientation, but to prevent discrimination in advertising. Trial testimony indicated that at least some of the Board members believed that, in effect, the self descriptive advertisements discriminated against non-gay or non-lesbian readers in much the same way as an advertisement stating "only homosexuals need apply."

Shattil testified that the policy barring such self descriptions was initially made by the student staff and subsequently adopted by the Publications Committee, which is predominately composed of students. Moreover, it is the student advertising editor who is authorized to interpret and apply this policy for the *Daily Nebraskan.*

On January 23, 1985, Pearn attempted to run the following two advertisements in the *Daily Nebraskan:* (1) "Lesbian woman needs roommate to share large 4 bedroom house with fireplace. $125 month-near south location-on bus line. 476-3996 evenings"; and (2) "Lesbian pet lover to share large 4 bedroom house with fireplace. $125 month-near south location-on bus line. 476-3996 evenings". Pearn was informed that neither advertisement would be printed because of the amended Publications Board policy. On August 25, 1985, Michael Sinn attempted to place an advertisement reading: "Gay male seeks roommate. Phone 423-7670. Try again!" The advertisement was refused as contrary to the advertising policy of the *Daily Nebraskan.* Filing # 4.

II. First Amendment Guarantees Extend to the University "Press".

The United States Supreme Court concluded in *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972), that the First Amendment is fully applicable to the states and "state colleges and universities are not enclaves immune from [its] sweep...." The campus newspaper of a state supported university is entitled to the constitutional protections afforded the "press," including freedom of expression for the editors. Editors necessarily exercise subjective discretion in refusing or accepting proffered materials. The degree of discretion which editors utilize in rejecting advertisements is not distinguishable, under the First Amendment analysis, from that exercised over any other submitted matter. The content chosen for publication necessarily involves interpretation and selection, which inevitably results in editorial suppression. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258 n. 24, 94 S.Ct. 2831, 2840 n. 24, 41 L.Ed.2d 730 (1974). Hence,

"[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the ... content of the paper, ... constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of free press as they have evolved to this time."

Id., 418 U.S. at 258, 94 S.Ct. at 2840.

Compelling the *Daily Nebraskan* to publish what it chooses to withhold would work a penalty on the newspaper. Its finite space and resources would be appropriated. Its editorial discretion would inescapably be intruded upon. Even if the paper were to experience no added cost or to omit no material it preferred to print, the First Amendment bars governmental impingement upon the functions of the editors. "A newspaper is more than a passive receptacle or conduit for news, comment, and advertising." *Miami Herald Publishing Co. v. Tornillo,* supra, at 256-258, 94 S.Ct. at 2838-2839.

Editorial freedom of expression has consistently prevailed where various forms of censorship were applied to student publications of state supported universities. A university may not suspend an editor for publishing controversial articles, *Trujillo v. Love,* 322 F.Supp. 1266 (Colo.1971); sup-

press objectionable material from publication, *Mississippi Gay Alliance v. Goudelock*, 536 F.2d 1073 (5th Cir.1976), *cert denied*, 430 U.S. 982, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977); withdraw or reduce financial support because of the newspaper's offensive content, *Stanley v. Magrath*, 719 F.2d 279 (8th Cir.1983); or regulate content to assure the compliance of printed materials with "responsible freedom of the press." *Antonelli v. Hammond*, 308 F.Supp. 1329 (D.Mass.1970).

UN–L fosters and protects editorial independence in four significant fashions:

First, the *Bylaws of the Board of Regents of the University of Nebraska* state that student publications must be supervised such that "editorial freedom will be maintained and that the corollary responsibilities will be governed by the canons of ethical journalism." Plaintiff's Exhibit # 1. The parties have stipulated that the Publications Board acts as a publisher for the *Daily Nebraskan* and is responsible for the newspaper's general business operation. However, the *Daily Nebraskan* is editorially independent. Filing # 4 and # 20. Thus, the information, opinions, and ideas expressed in the *Daily Nebraskan* are those of the editors and writers presently operating the newspaper and not those of the University.

Second, within the *Guidelines For The Student Press,* is a statement made by the Board of Regents in 1918 which is periodically reaffirmed:

"The editorial policies of the Student Publications shall be entirely in the hands of student editors and no faculty member or University officer shall interfere in such policies...."

Plaintiff's Exhibit # 3.

Third, Article 4, Section D, Joint Statement on Rights & Freedoms of Students of the *Guidelines For The Student Press* says:

"In the delegation of editorial responsibility to students the institution must provide sufficient editorial freedom and financial autonomy for the student publications to maintain their integrity of pur-

pose as vehicles for free inquiry and free expression in an academic community....

As safeguards for the editorial freedom of student publications the following provisions are necessary:

(1) [t]he student press should be free of censorship and advance approval of copy and its editors and managers should be free to develop their own editorial policies and news coverage, (2) [e]ditors and managers ... should be protected from arbitrary suspension and removal because of ... disapproval of editorial policy or content ... [and] (3) [a]ll ... publications should explicitly state on the editorial page that the opinions there expressed are not necessarily those of the college, University, or student body....

[A]lthough the Publications Committee is responsible for assuring that the published material is within the code of ethics, this in no way suggests] that the [Committee can] censor the content of the student newspapers."

Plaintiff's Exhibit # 3.

Fourth, it is stipulated that the *Daily Nebraskan* facilitates communication between the University and the students by printing various announcements. But, the *Daily Nebraskan* does not guarantee that University announcements will be printed. To insure that information which the University wishes to put before the students appears in the newspaper, the University must purchase advertising space. Filing # 20. The *Daily Nebraskan* ultimately determines what University announcements are published.

The *Daily Nebraskan* safeguards its professional judgment by avoiding conflicts of interest or the appearance of impropriety. No staff member is permitted to serve as an ASUN Senator, on ASUN subcommittees, or on the Publications Committee. The *Daily Nebraskan* is informed of all campus affiliations of its employees to forestall the assignment of stories regarding an organization to a past or present member. Plaintiff's Exhibit # 3.

The articulated mission of the *Daily Nebraskan* is to "publish a quality daily newspaper for and about the campus community; and thereby to provide quality experience for students involved in its production." Plaintiff's Exhibit # 3. The newspaper furthers the state's interest in providing University students with a rich and diverse educational environment. There is no suggestion that the *Daily Nebraskan* was created or, in fact, serves as a means for the propagation of University philosophies.

It is clear that in the exercise of editorial discretion, the *Daily Nebraskan* is distinguishable from the state. Although the editor-in-chief and general manager are hired by the Publications Committee, Plaintiff's Exhibit # 2, the editor-in-chief "formulates editorial policy, which represents the opinion of the *Daily Nebraskan* as an institution." Plaintiff's Exhibit # 3. There is no evidence that the University, contrary to the expressed protections contained within the *Guidelines For The Student Press*, has attempted, through the Publications Committee or otherwise, to regulate or direct the content of the *Daily Nebraskan*. Moreover, case law indicates that the First Amendment prohibits the University from doing so.

III. "State Action" Is Not Present In The Editorial Decision-Making Of The *Daily Nebraskan*.

 No precise method of determining the existence of state action exists; consequently, a cautious analysis of the quality and degree of the government relationship to the challenged acts is required. *Columbia Broadcasting System Inc. v. Democratic National Committee*, 412 U.S. 94, 115, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973). Given the extensive reach of government, "a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts and circumstances present." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726,

81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961). Adherence to the state action requirement:

"preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

The most recent discussion of state action appears in the trilogy cases, *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and *Lugar v. Edmondson Oil Co.*, supra. These Supreme Court cases are instructive, but not dispositive, since each deals with the concept of state action as it applies to the conduct of wholly private parties. Here, the *Daily Nebraskan* is a hybrid. It functions as a private newspaper for some purposes, but as an agency of the state in all other respects.

It must be conceded that the *Daily Nebraskan* is an instrumentality of the state. The *Daily Nebraskan* is a creation of the University of Nebraska-Lincoln, thus is sponsored by the state. Moreover, the *Guidelines For The Student Press* state:

"Whenever possible the student newspaper should be an independent corporation financially and legally separate from the University. Where financial and legal autonomy is not possible, the institution, as the publisher of student publications, may have to bear the legal responsibility for the contents of the publications." Plaintiff's Exhibit # 3.

The offices of the *Daily Nebraskan*, which occupy approximately 2,694 square feet, are located in the basement of the Nebraska Union, which sits on the city campus of the University of Nebraska-Lincoln (UN-L). The Nebraska Union was constructed with funds financed through the issuance of revenue bonds. The title to the Nebraska Union is held by the Board of Regents of UN-L and the University, by statute, may not dispose of the grounds

upon which University buildings are located without the consent of the legislature. Filing # 20.

The *Daily Nebraskan* does not pay for its office space, janitorial service, campus police protection, or utilities. The annual cost of maintenance and repair for the *Daily Nebraskan* is $7,624.00. Utilities are provided by the Nebraska Union which receives its budget from the University Program and Facilities Fees. Although the *Daily Nebraskan* receives no state appropriations or tuition revenues, the newspaper does expect to receive, over the course of the academic year, approximately 5% or $39,000 in University Program and Facilities Fees, which are student fees assessed on a credit-hour-per-semester basis. The *Daily Nebraskan* is eligible to receive fees from "Fund A" which are refundable to the students. All such monies received are exclusively earmarked for production and printing costs. The bulk of the campus newspaper's revenues are generated from advertising and sales. The newspaper is not affiliated with the College of Journalism. Filing # 20.

The *Daily Nebraskan* maintains its own bank account. The newspaper employs approximately 175 employees, of which 10 are nonstudents. Three professional staff payroll checks are processed through the University system, the remainder of the employee checks are processed through the *Daily Nebraskan* payroll system. All salaries are paid through the self generated funds of the *Daily Nebraskan*.

Although the *Daily Nebraskan* is a creature of the state, the campus newspaper is not an agency of the state for all purposes. *Arrington v. Taylor,* 380 F.Supp. 1348, 1359–1360 (M.D.N.C.1974), *aff'd,* 526 F.2d 587 (1975), *cert denied,* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). In its editorial decision making the *Daily Nebraskan* functions like a private newspaper. Thus, the exercise of editorial discretion does not constitute state action.

The *Daily Nebraskan* is analogous to the public defender found not to be a state actor for all purposes in *Polk County v.*

*Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). The Supreme Court concluded that although the state paid the salary of the public defender, the relationship between the public defender and her client was "identical to that existing between any other lawyer and client." *Id.* at 318, 102 S.Ct. at 449. A defense attorney

> "best serves the public, not by acting on behalf of the State or in concert with it, but rather by advancing 'the undivided interests of his client.' This is essentially a private function ... for which state office and authority are not needed."

*Id.* at 318–319, 102 S.Ct. at 449–450. As is the case with the public defender, the *Daily Nebraskan* does not act in tandem with the state in exercising its "independent professional judgment". Yet, the public defender is a state actor in other contexts. The Supreme Court noted that a public defender does act on behalf of the state in making hiring and firing decisions and perhaps in the performance of certain administrative and investigative functions.

In *Rendell-Baker v. Kohn,* supra, and *Blum v. Yaretsky,* supra, the factors taken into consideration by the Court in determining whether the state was responsible for the decision of a private entity were: (1) extensive regulation, (2) receipt of public funds, (3) type of function involved, and (4) presence of a symbiotic relationship. For the purposes of this case, only the resolution of the state funding and regulation issues are relevant. The Court concluded that regulation and subsidization of the entity, without more, do not convert private action into that of the state. The Court stated that:

> "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State ... Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives...." (citations omitted).

*Blum v. Yaretsky,* supra, 457 U.S. at 1004–1005, 102 S.Ct. at 2785–2786. Moreover, the Court in *Blum* determined that although the state took action in response to the decision of a private institution, this action did not render the state responsible for the decision. *Id.,* 457 U.S. at 1005, 102 S.Ct. at 2786.

The trilogy of cases reflect the Supreme Court's concern that the challenged action be "fairly attributable" to the state. The state is responsible for the decision of a private party where it has affirmatively compelled or directed the result. The evidence in the present case indicates that the Publications Committee, in support of the prior decision of the editor-in-chief not to print Pearn's advertisement, amended its policy regarding discrimination in advertising. Nevertheless, the student advertising editor ultimately interpreted and necessarily applied the policy. Moreover, the University, acting through the Publications Committee or otherwise, could not have directed the *Daily Nebraskan* not to publish the advertisement had it chosen to do so. Censorship of content impermissibly would exist if the University were to dictate what the *Daily Nebraskan* could or could not print. Consequently, I do not find that the rejection of the plaintiffs' advertisements "must in law be deemed to be that of the state."

### IV. Applicability of the Public Forum Doctrine, Commercial Speech, and Equal Protection Clause.

Implicit to the invocation of the doctrines of public function or commercial speech or the equal protection clause is *governmental* restriction of free speech. In this case, no state action was involved in the challenged decision of the *Daily Nebraskan.* Assuming arguendo that state action existed, the resolution of the case is unchanged.

### A.

■ The First Amendment not only protects free speech and press, but public places for purposes of expressive activity. A constitutional right of access to a public forum is guaranteed to all. However, this concept of equal access does not attach to government property which is not a public forum.

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue".

*Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In *Perry,* the Supreme Court concluded that a public school district, pursuant to a collective bargaining agreement, could constitutionally limit access of the interschool mail system and teacher mailboxes to the union that was the exclusive bargaining agent of the teachers. The Court found that denying a rival union access rights to the mail facilities implicated constitutional interests as free speech applied to teacher mailboxes. Nevertheless, the First Amendment does not require "equivalent access to all parts of a school building in which some form of communicative activity occurs." *Id.*

The Court identified three public forums. First, the "quintessential public forums" are the streets, sidewalks, and parks, "which ... from time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.,* 460 U.S. at 45, 103 S.Ct. at 954. Second, property the state has generally opened for use by the public for expressive activity. The same constitutional standards apply to both classifications. The government may neither prohibit all communicative activity nor enforce a content-based exclusion where the regulation is not narrowly drawn to serve a compelling state interest. *Id.* Third, where public property which is not by tradition or designation a forum for public communication is involved, there is no *per se* constitutional right of access. The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.,* 460 U.S. at 46, 103 S.Ct. at 955. Also, the state may not only

regulate the time, place, and manner of the expressive activity, but

> "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

The Court determined that the school mail facilities fit the third classification despite prior utilization of the teacher mailboxes by a rival union and several civic and church organizations. The school district, in neither policy nor practice, had opened its mail system to indiscriminate use by the general public. Permission to use the mail system was required, but not automatically granted by the building principal. The Court concluded that "selective access does not transform government property into a public forum." *Id.*, 460 U.S. at 47, 103 S.Ct. at 956. Moreover, "the mere fact that an instrumentality is used for the communication of ideas does not make a public forum...." *Id.*, 460 U.S. at 49, n. 9, 103 S.Ct. at 957 n. 9.

■ The reason stated in the *Perry* case are the reasons that fit here. The *Daily Nebraskan* has not consented to unrestricted access by the general public to its pages. There is no evidence that the *Daily Nebraskan* has relinquished its editorial control over advertisements by accepting proffered material as a matter of course. It is the presence of this editorial discretion which precludes a constitutional right of access to the columns of the newspaper. See *Miami Herald Publishing Co. v. Tornillo*, supra, 418 U.S. at 251–256, 94 S.Ct. at 2836–2839. Consequently, neither newspapers in general nor the *Daily Nebraskan* in particular may be characterized as a public forum.

■ Since the *Daily Nebraskan* falls within the third category of public forums, the newspaper may limit the plaintiffs' expression.

> "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves."

*Perry Education Association v. Perry Local Educators' Association*, supra, 460 U.S. at 49, 103 S.Ct. at 957.

Thus, the government regulation must be (1) reasonable in light of the purpose which the forum serves and (2) not an attempt to suppress expression which the state finds offensive. It was not unreasonable for the *Daily Nebraskan* to find that the plaintiffs' advertisements, in effect, discriminated against readers on the basis of sexual orientation. Additionally, it is foreseeable that compelling the publication of such advertisements would open the door to less subtle forms of discrimination in the advertising columns. No evidence suggests that the advertisements were rejected because the expression of a gay or lesbian orientation was offensive to the editors. Where government property that is not a public forum is involved,

> "speech is not equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used."

*Id.*, 460 U.S. at 55, 103 S.Ct. at 960.

### B.

It is not necessary to decide whether the plaintiffs' advertisements are "commercial speech", because the outcome of the decision, in any event, is not affected. Commercial speech is accorded less protection than other constitutionally guaranteed expression. *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 562–563, 100 S.Ct. 2343, 2349–2350, 65 L.Ed.2d 341 (1980); *Casbah, Inc. v. Thone*, 651 F.2d 551, 563, (8th Cir.1981). The plaintiffs' freedom to express their respective sexual orientations, viewed in light

of the full protections afforded by the First Amendment, do not prevail against editorial freedom of expression. Characterizing the plaintiffs' expression as commercial speech, which is "of less constitutional moment than other forms of speech," *Central Hudson Gas & Electric Corp. v. Public Service Commission,* supra, 447 U.S. at 562–563, n. 5, 100 S.Ct. at 2349–2350 n. 5, certainly does not command a differing result.

### C.

The plaintiffs argue that the denial of access to the columns of the Daily Nebraskan violates the Equal Protection Clause. This contention, for the same reasoning as found in *Perry Education Association v. Perry Local Educators' Association,* supra, is nonmeritorious. In *Perry,* the Court rejected the First Amendment argument that differential access to the school mail facilities constituted impermissible content discrimination and "it fares no better in equal protection garb." *Id.* 460 U.S. at 54, 103 S.Ct. at 960. Since no fundamental right was implicated, the corresponding strict scrutiny standard was inapplicable. The governmental regulation need only rationally further a legitimate state purpose. *Id.* at 54, 103 S.Ct. at 960. The rejection of the plaintiffs' proffered advertisements has previously been determined a reasonable means to prevent discrimination in advertising.

### V. Conclusion.

The plaintiffs have no constitutional right that compels the *Daily Nebraskan* to open its columns to all who are willing to pay to publish their sexual orientation in a roommate advertisement. The inevitable result of such a compulsion would be the usurpation of editorial discretion. Rejection of an advertisement is a constitutionally protected editorial decision in nowise diminished by state support or subsidization. *Avins v. Rutgers,* 385 F.2d 151, 153–154 (3rd Cir.1968); *Associates & Aldrich Co. v. Times Mirror Co.,* 440 F.2d 133, 135 (9th

Cir.1971); and *Mississippi Gay Alliance v. Goudelock,* supra, at 1075.

Pursuant to the memorandum of decision of today,

IT IS ORDERED that judgment is entered for the defendants.