**GAY AND LESBIAN STUDENTS ASSOCIATION, An Unincorporated Association, Plaintiff,**

v.

**Lyle GOHN, Individually and in his Official Capacity as Vice-Chancellor for Student Services at The University of Arkansas, Fayetteville; Hugh B. Chalmers, Jack L. Williams, Hall McAdams, Kaneaster Hodges, Gus Blass, Morris Andrew Jackson, W. Sykes Harris, Sr., W. Maurice Smith, Jr., Jim Blair, and Sandy Ledbetter, in their Official Capacities as Members of the Board of Trustees of the University of Arkansas, Defendants.**

Civ. No. 86–5052.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

March 23, 1987.

Clayton Blackstock and Marcia Barnes, of Mitchell and Roachell, Little Rock, Ark., for plaintiff.

Fred H. Harrison, Gen. Counsel, University of Arkansas, Little Rock, Ark., Ginger P. Crisp, Associate Gen. Counsel, University of Arkansas, Fayetteville, Ark., C.R. McNair, III, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action for declaratory and injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202. The court has jurisdiction under the provisions of these sections and 28 U.S.C. § 1343(3) and (4).

Plaintiff is the Gay and Lesbian Students Association (GLSA).[1] Defendant, Lyle Gohn, is sued in his individual and official capacity as Chancellor for Student Services at the University of Arkansas, Fayetteville. Defendants, Hugh B. Chalmers, Jack L. Williams, Hall McAdams, Kaneaster Hodges, Gus Blass, Morris Andrew Jackson, W. Sykes Harris, Sr., W. Maurice Smith, Jr., Jim Blair and Sandy Ledbetter, are sued in their official capacities as members of the Board of Trustees of the University of Arkansas.

GLSA brought this action after they were denied funding by the student senate. Plaintiff asserts that funding is a basic benefit that stems from the constitutional right of registration as a student organiza-tion. In addition, plaintiff contends that the denial of funding constitutes a "content based" discrimination against GLSA for its exercise of its rights of association and free speech under the First and Fourteenth Amendments. Finally, GLSA contends that its right to Equal Protection under the Fourteenth Amendment has been violated.

The University of Arkansas is a publicly funded university governed by a Board of Trustees.[2] Campus governance of students is generally by means of the Associated Student Government (ASG) which was established and its organization adopted by members of the student body. ASG exists pursuant to a constitution, approved at its inception by the Board of Trustees. ASG was formed to accord students the opportunity to participate in decisions affecting them, to provide needed services for students and to further the best interests of the University of Arkansas and its student body. Under article 2, section 4, of the ASG Constitution, the student senate has the power to appropriate all monies and to require an accounting of funds received and appropriated from the student service funds, which consists of all monies allocated thereto by the Board of Trustees.

GLSA is a properly registered student organization at the University of Arkansas, Fayetteville. A registered student organization has the use of university facilities, is listed in university publications, and is allowed to use the university name in publicity and press releases.[3] Registration is a

1. GLSA's stated purpose is to educate all interested persons about homosexuality and homophobia (the fear of homosexuals) and to provide a support group for homosexuals and their friends to increase self-worth and esteem.

2. *See generally* Ark.Stat.Ann. § 80–2812 (Repl. 1980).

3. A registered student organization is defined in The "A" Book, the University's student handbook, as (1) a registered University student organization—one that successfully completes the registration requirements and receives financial support from University sources; or (2) a registered independent student organization—one that successfully completes the registration requirements and receives no financial assistance of any kind from University sources. Registra-tion requires that the following information be provided: (1) the name of the organization; (2) a declaration of the purposes, goals, activities, etc., or a constitution of the organization; (3) a list of officers or official representatives of the organization; (4) registration attests that the local organization agrees: (a) to provide equal opportunity to all students; (b) to prohibit discrimination against any member or prospective member because of race, sex, color, religion, age, national origin, disability, or veteran's status; (c) to promote the realization of equal opportunity through affirmative action. Certain groups, such as social fraternities and sororities, governing organizations in single-sex residence halls, and other organizations specifically exempted from Title IX of the Education Amendment of 1972, may rightfully exclude men or women; and (5) the name of a faculty or staff adviser.

prerequisite to eligibility to request "B" funds.[4] Basically the process consists of filing a request for appropriation of funds with the finance committee, the finance committee then makes a recommendation to the senate, which by vote approves or denies the funding requests. Groups requesting funds are required to have a member present at the senate meeting when the vote is taken. The "A" Book provides for an appeal from the funding decision to the Vice-Chancellor for Student Services.

Both parties agree to the following facts: In January, 1983, the student senate did not appropriate "B" funds for GLSA and on appeal to the Vice-Chancellor for Student Services, Lyle Gohn, this action was upheld.[5] In 1984, GLSA requested and received "B" funds. This funding was apparently in a "package" with other student organizations. In the spring of 1985, the student senate passed a bill which was vetoed by the president. The bill would have prohibited any future funding of GLSA.[6] In the fall of 1985, GLSA was denied funding by a vote of the senate.[7] On appeal, the denial was upheld by Lyle Gohn.[8] At trial and through its briefs,

plaintiff relates and relies on various other allegedly discriminatory acts carried out by members of the student body or community.[9]

Upon these facts the plaintiff asserts that the University, through its Vice-Chancellor, the Board of Trustees and the ASG, curtailed its fundamental rights of free association and free speech and violated the Equal Protection Clause.

The University relies on a threefold defense. Initially, the defendants contend that the action is moot since each funding period is separate and distinct and plaintiff has not sought funds since the fall of 1985. Secondly, defendants argue that the state action prerequisite to a Fourteenth Amendment constitutional claim is not present. The defendants urge the court to find that the actions of the student government are distinct from those of the University itself, thus, there is no state action; that the only role played by administrators is creation of the source of funding as part of the overall University budget, and consideration of funding appeals. Finally, it is the University's contention that the First Amendment rights of the plaintiff were not infringed by the denial of funding and that the proce-

---

4. ASG Code, Title VIII, § 1(2.1). "B" funds are funds allocated by the student senate to student organizations to meet special needs or to fund specific projects.

5. Plaintiff contends that various statements were made on the floor of the senate concerning the possible illegality of homosexual behavior in light of the Arkansas sodomy law and that remarks were made to the effect that state money should not go to homosexuals.

6. The bill would have added any organization whose primary function is the promotion of a sexual preference or the education thereof to the list of organizations not eligible for funds. This wording would encompass GLSA.

7. The request was for $225.00 to fund the presentation of a movie, "Before Stonewall," concerning the history and lifestyles of homosexuals, and two workshops, one on racism and the other on homophobia. On November 19, 1985, the student senate by vote of 34 to 21 did not appropriate the funds requested by GLSA.

8. Gohn's reasoning was based on his stated belief in the principles and rights of student leadership and student governance. *See* letter to

Linda Lovell dated December 9, 1985 (Plaintiff's Ex. 12).

9. Circumstances relied upon by plaintiff include: (1) State Representative Dowd's House Resolution 25 urging the administrators of the University to refuse to assist in any manner homosexual groups on campus; (2) a meeting held during the summer of 1985 involving the Chancellor and President of the college along with two members of the Board of Trustees and several state legislators which involved at least some discussion concerning the amount of recent publicity generated concerning gay issues on campus; (3) defacing of a sign advertising "Gay and Lesbian Culture Week" held on campus April 14–18, 1985; (4) temporary formation of a group, United Students Association, expressing the opposite view of that advocated by GLSA; (5) a report to the University police that fireworks had been exploded in the hallway outside the room being used for a GLSA meeting; (6) threats made against the then president of GLSA; (7) the refusal of the then Chancellor, Willard Gatewood, to fund the Human Relations Committee's (HRC) workshop on discrimination and stereotyping for University personnel if the workshop included a segment on discrimination and stereotyping of homosexuals.

dures as now set up serve legitimate state purposes. The procedure allows the student senate the ultimate decision in funding the projects of student organizations based on the senators' own evaluations as to how beneficial and educational the projects are to the University community as a whole.

## I. Mootness

Article III operates as a limit on the jurisdiction of the federal courts; the courts may decide only actual cases or controversies. A case is regarded as moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969)). It is from this requirement that the ban on advisory opinions has developed. The controversy requirement of the Declaratory Judgment Act is identical with that of Article III of the Constitution. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1974).

■ A case is regarded as moot if it raised a justiciable controversy at the time the complaint was filed, but subsequent events have deprived the litigant of a personal stake in the controversy. Nowak, Rotunda, Young, *Constitutional Law* § IV, at 65. In determining whether the case is moot the court looks to see whether the opinion will affect the rights of the litigants before it. *Amalgamated Association of St. Elec. Ry. and Motor Coach Employees of America, Division 998 v. Wisconsin Employment Relations Board*, 340 U.S. 416, 71 S.Ct. 373, 95 L.Ed. 389 (1951). Furthermore, the controversy must be one for which the court can fashion specific and conclusive relief. *Aetna, supra*, 300 U.S. at 240–41, 57 S.Ct. at 463–64. The Supreme Court in *Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), stated that "the question was no longer live because even a favorable decision on it would not have entitled Hunt [the

petitioner] to [relief]." *Id.* at 481–82, 102 S.Ct. at 1183.

The mootness doctrine is regarded as a mixture of constitutional limitations and prudential considerations which are based largely on public policy. The Supreme Court has recognized several exceptions to this doctrine which operate to mitigate its harshness, to prevent either party from depriving the court of jurisdiction, and to enable certain cases involving controversies of relatively short duration to be heard by the court. The two main exceptions are voluntary cessation by the defendant and situations where the controversy is regarded as "capable of repetition, yet evading review." The latter exception applies in the context of this case.

Under this exception, to avoid being determined moot, there must be a "reasonable expectation" or a "demonstrated probability" that the petitioner will again be subjected to the same alleged violation. *Murphy, supra*, at 482, 102 S.Ct. at 1183; *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Generally,

> in the absence of a class action, the "capable of repetition, yet evading review" doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

*Weinstein*, 423 U.S. at 149, 96 S.Ct. at 349.

■ Both parties cite the following cases: *Carson v. Pierce*, 719 F.2d 931 (8th Cir.1983); *United Indians of Nebraska v. Donovan*, 702 F.2d 673 (8th Cir.1983); *Dyer v. SEC*, 251 F.2d 512 (8th Cir.1958), *vacated*, 359 U.S. 499, 79 S.Ct. 1115, 3 L.Ed.2d 976, *judgment recalled*, 361 U.S. 803, 80 S.Ct. 40, 4 L.Ed.2d 52 (1959). *Dyer* involved the review of an order of the SEC which permitted the company involved to use a certain declaration in the solicitation of proxies for use at a shareholders meeting. *Dyer, supra*, at 513. As the Eighth Circuit notes, the sole purpose of the pro-

ceeding was to prevent the company from soliciting proxies for the April 20, 1957, meeting because of the alleged omission of certain proposals submitted by petitioners. *Dyer, supra*, at 513. Once the solicitation was over the opinion of the court could not affect the rights of the litigants before it and the reversal of the SEC's decision would have no effect. The litigants in *Dyer* were seeking to overturn the specific decision and were not challenging the basis on which the decision was made.

*United Indians, supra*, involved a petition for review of the denial of CETA (Comprehensive Employment and Training Act) funds. The court held that the issue was moot since not only had the fiscal year expired but the CETA program itself had ceased to exist. Defendants seek to draw an analogy to this case, since the fiscal year of the University has passed. (Defendants' post trial brief at 6.) Again, this argument is based on each fiscal period being regarded as separate and distinct while plaintiff is challenging not the specific denial of funding but the alleged policy of discrimination that is evidenced by the denial.

*Carson v. Pierce*, 719 F.2d 931 (8th Cir. 1983), *reh'g denied*, 726 F.2d 411 (8th Cir. 1984), dealt with a challenge to a clause in a lease prohibiting the residence of families having more than two children. This clause was allegedly in violation of HUD regulations. Plaintiffs brought an action to declare illegal and enjoin enforcement of the policy on the grounds it discriminated unlawfully against families with children. The court held that because none of the individual plaintiffs now lived at the defendants' apartments that the issue was moot.

> The value of the relief which the plaintiffs sought from the private defendants, however, was dependent upon either the plaintiffs continued residence or desire to reside in the private defendants' apartments.... If declaratory relief or an injunction were to be granted, it would have no effect on the individual plaintiffs since they no longer live in the apartments nor are they seeking readmission.

*Carson*, 719 F.2d at 933. Therefore, any relief the court could have granted would not have affected the plaintiffs because they no longer had a personal stake in the matter. "Rather, our decision would answer the hypothetical question of whether the disputed policy constitutes unlawful discrimination." *Id.* at 933. *See also Backus v. Baptist Medical Center*, 671 F.2d 1100, 1103 (8th Cir.1982).

In addition, defendants also rely on *Board of School Commissioners of the City of Indianapolis v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), involved a purported class action, consisting of six plaintiffs, challenging the constitutionality of certain school rules which allegedly interfered with the publication of the school newspaper. The court made the determination that the action was moot since all six plaintiffs had graduated and were no longer subject to the rules and regulations of the school officials. In making this determination, the court stated that "the case is therefore moot unless it was duly certified as a class action ..., a controversy still exists between petitioners and the present members of the class, and the issue in controversy is such that it is capable of repetition, yet evading review." *Id.* at 129, 95 S.Ct. at 850.

Perhaps somewhat more in line with the present case is *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), which involved a cyclically recurring fact pattern. Here, the employer engaged in recurring bargaining with the employees' union and the state continuously followed a policy of allowing striking workers to obtain employment compensation. The Court held it was enough that plaintiff showed "the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest" and further noted that the duration of a strike was not long enough for "complete judicial review of the controversies they engender." *Id.* at 125–26, 94 S.Ct. at 1699–1700.

The defendants argue that, since the composition of the senate is constantly

changing, each funding period should be treated as separate and distinct. Defendants urge the court to dismiss plaintiff's complaint as moot on the grounds that changed circumstances at the University prevent a finding that the denial of funds is "capable of repetition yet evading review." (Defendants' post trial brief at 8.) Defendants also point out that GLSA's lobbying efforts have resulted in the election of senators who would now support funding. Further, defendants contend that plaintiff has withdrawn from the controversy by not seeking funding since the denial in the fall of 1985.

After having carefully reviewed the testimony and briefs in this case, the court concludes that the following facts establish that a "live" controversy does presently exist between the plaintiff and the University:

1. Gohn is still Vice-Chancellor for Student Services and student senate advisor.

2. Gohn has authority to overturn decisions of the student senate but supports and continues to support their right to deny funding. (Plaintiff's Ex. 59, p. 97, lines 6–10.)

3. GLSA is still a registered student organization that must apply for "B" funds. (Post trial brief, p. 14.)

4. The student senate still has total discretion through the voting procedure to allocate or withhold "B" funds.

5. That an ongoing controversy is evidenced by the senate's 1983 denial; the 1984 controversial grant; Beutelshies' bill to prevent any funding to GLSA; the 1985 denial; the 1985 granting of funds to organizations not meeting the requirements of the ASG Code; the senate's policy of granting money to all organizations who meet the criteria, except GLSA. (Plaintiff's reply brief, p. 4.)

6. It would seem violative of the funding system to require the plaintiff to seek "B" funds, which are available only for special projects and not ordinary administrative expenses, when they had no present need for the funds, to avoid determination that the lawsuit was moot.

This finding necessitates an examination of plaintiff's prima facie case.

## II. State Action

An essential element of the plaintiff's prima facie case is the existence of state action. The plaintiff must establish that the alleged violations are "fairly attributable to the state." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). This requirement operates to preserve "individual freedom by limiting the reach of federal law and federal judicial power," and avoids "imposing on the State, its agencies or officials, responsibility for conduct for which they cannot be fairly blamed." *Id.* at 936, 102 S.Ct. at 2753.

Under section 1983 the deprivation of a federal right must be made "under color of law" to be actionable. The Supreme Court has treated this requirement as being virtually identical to the "state action" requirement of the Fourteenth Amendment. *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966). The decision as to whether state action is present is made on a case by case basis. "Only by sifting facts and weighing circumstances ..." can such a determination be made. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

Various tests have been used by the Supreme Court in determining whether what is nominally private conduct is to be treated as if it were state action. Two such tests are the symbiotic relationship test and the state function test. Nahmod, *Civil Rights and Civil Liberties Litigation, The Law of Section 1983,* § 2.01 (2d ed. 1986).

The symbiotic relationship test revolves around the mutually beneficial relation between the state and the private discriminator. The focus is placed on extensive contacts between the state and private party in such a way that each benefits from the other's conduct. Generally, "state action exists (1) where the state and the private party or entity maintain a sufficiently in-

terdependent or symbiotic relationship; (2) where the state requires, encourages, or is otherwise significantly involved in nominally private conduct; and (3) where the private person or entity exercises a traditional state function." Nahmod, § 2.04.

The Supreme Court, in a trilogy of cases, has narrowed the symbiotic relationship test by what can be termed a nexus requirement. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The Court in *Rendell-Baker* and *Blum* followed a four-step analysis: (1) the extent of state regulation; (2) receipt of public funds; (3) type of function involved; (4) presence of a symbiotic relationship.

In *Lugar, supra,* the Court enunciated a two-part approach to the question of fair attribution:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar, supra,* 457 U.S. at 937, 102 S.Ct. at 2753.

*Sellman v. Baruch College of City University of New York,* 482 F.Supp. 475 (1979), is illustrative as to the present set of facts. In *Sellman* the court faced the issue whether an action by the student government was state action. The court focused on the organization and how it fit into the scheme of campus governance.

> Its branches are advised and guided by faculty members; its constitution is required to be compatible with guidelines fostered by the Board of Higher Education; the Dean of Students, a government employee, is the final arbiter of election disputes. The student government receives money, both to cover its operating expenses and to fund the activities it supervises, from mandatory student fees collected by the College from the entire student body. Finally, its meetings are held on campus during hours specifically set aside by the College for student activities; thus, it may be presumed that both the College and the students derive benefit from this interlocking relationship.

*Id.* at 478. On the basis of these factors, the court found that the state was sufficiently involved in the actions of the student government to be attributed to the state itself. *Id.* at 479. *See also Krynicky v. University of Pittsburgh,* 742 F.2d 94 (3d Cir.1984) (determination that a private university that received funds from the state and was statutorily recognized as part of the state system, actions were attributable to the state); *Kania v. Fordham,* 702 F.2d 475 (4th Cir.1983) (student newspaper at UNC at Chapel Hill found implicitly to be state activity); *Uzzell v. Friday,* 592 F.Supp. 1502 (M.D.N.C.1984) (adoption and utilization of a minority provision in the student constitution under authority of the Chancellor derived ultimately from the statutes of the state constituted the requisite state action).

Defendants cite and rely heavily on *Sinn v. Daily Nebraskan,* 638 F.Supp. 143 (D.Neb.1986), where the court determined the student newspaper was a hybrid. "It functions as a private newspaper for some purposes, but as an agency of the state in all other respects." *Id.* at 148. This case concerned an editorial decision to refuse to print an ad that stated the sexual preference of the individual seeking a roommate as being a lesbian. While the court concluded that the newspaper was an instrumentality of the state it went on to decide that certain editorial functions could not be fairly attributable to the state. This conclusion was reached after an examination of the trilogy of cases by the Supreme Court. "The state is responsible for the decision of a private party where it has

affirmatively compelled or directed the result." *Id.* at 150.

This determination was based mainly on the finding that the University could not have directed the publication or nonpublication of the advertisements carried in the student newspaper. "Moreover, the University, acting through the Publications Committee or otherwise could not have directed the *Daily Nebraskan* not to publish the advertisement had it chosen to do so. Censorship of content impermissibly would exist if the University were to dictate what the *Daily Nebraskan* could or could not print." *Id.* at 150 (emphasis in original).

The factors examined by the court in making the initial determination that the newspaper was a state instrumentality were very similar to those used by the court in *Sellman.* The exclusion of certain editorial decisions could largely be attributable to the maintenance of freedom of the press. In addition, no one on the faculty had the power to interfere with these decisions and, in fact, the court pointed out that the policy encompassed in the Guidelines for Student Press was not to interfere in any manner with these decisions. However, in all other aspects the actions of the newspaper staff would be attributable to the state.

In the present case the student senate and ASG are the creation of the state; the constitution was approved by the Board of Trustees; the Board is given by statute the authority to govern the University; ASG occupies offices and receives funding from the state; the funding that is disbursed as "B" funds comes from appropriations of the University; the Vice-Chancellor has the final say as to funding decisions through his power to hear appeals. On the basis of these factors, the court finds the decisions of the student senate are fairly attributable to the state since this University is "fully public."

## III.  First Amendment Rights

A.  *Whether funding is a basic benefit stemming from the constitutional right of recognition?*

██  Clearly, the University cannot without justification deny a gay student orga-

nization the right to recognition and all the privileges that go with it.  *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Gay Lib v. University of Missouri,* 558 F.2d 848 (8th Cir.1977); *Gay Alliance of Students v. Matthews,* 544 F.2d 162 (4th Cir.1976); *Gay Students Organization of University of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir.1974).  This right includes the right to use campus facilities and the right to use campus bulletin boards and other means of communication to disseminate information.  In addition, the right of recognition appears to extend to the right to *apply* for financial support. *Healy, supra,* 408 U.S. at 182, 92 S.Ct. 2346; *Gay Lib, supra,* at 850.

However, the courts have stopped short of including the right to *receive* funding as one of the associational rights due campus organizations.  In *Healy* the court stated that:

> It is unclear on this record whether recognition also carries with it a right to seek funds from the school budget.  ... Since it appears that, at the least, recognition only entitles a group to apply for funds, and since the record is silent as to the criteria used in allocating such funds, we do not consider possible funding as an associational aspect of nonrecognition in this case.

*Healy, supra,* 408 U.S. at 182 n. 8, 92 S.Ct. at 2346 n. 8.  The Court in *Healy* was concerned with those rights it deemed essential to the right of association.  The question here is whether funding is deemed to be essential to the exercise of the right of association.  *See* Comment, *Beyond Tinker and Healy: Applying the First Amendment to Student Activities,* 78 Col. L.Rev. 1700, 1710 (1978).

A finding that the right to funding is encompassed within or is an essential element of the right of association would appear to limit a university's determination of how to divide up available funds.  Using defendants' figures as an example, during the year 1985–86 there were 200 registered student organizations.  According to the criteria for "B" funding it was determined

over 100 of these organizations were eligible to apply for "B" funds, while only 21 applied. The total amount of "B" funds available was $6,200.00. One must assume that if funding is regarded as essential, most if not all student groups would request funding thus limiting the ability of the student senate to allocate funds.

*Maryland Public Interest Research v. Elkins,* 565 F.2d 864 (4th Cir.1977) (referred to as *MaryPIRG*), addressed the issue of whether a university could condition the receipt of funds by a student organization. The University granted an allowance to *MaryPIRG* on the condition that the funds not be used to pay litigation expenses. The court upheld this limitation on the use of funds against the challenge that this infringed the organization's free exercise of First Amendment rights. "There is no affirmative commandment upon the University to activate Mary-PIRG's exercise of First Amendment guarantees; the only commandment is not to infringe their enjoyment." *Id.* at 866.

Similarly, the abortion funding cases lend support to the idea that funding is not encompassed within the right to association. The Supreme Court in *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), upheld a state regulation prohibiting the use of state funds for abortion related services. A state has no constitutional obligation to fund or promote abortion and "is not required to show a compelling interest for its policy choice...." *Id.* at 477, 97 S.Ct. at 2384.

Indeed, the court in *Healy* focused on the effect of denial of recognition and how this impermissibly infringed on the organization's right to use the University for association and expression of ideas. In the case at hand, the alleged infringement is the result of denial of funds, yet plaintiff admits that all the projects that were the subject of the funding request have been carried out. Plaintiff has had equal access to use of campus facilities and means of communication. Therefore, plaintiff's First Amendment rights are not being infringed by the refusal of the University to "subsidize" those rights. *See Regan v. Taxation*

*With Representation of Washington,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).

**B.** *Whether a "content based" discrimination infringed plaintiff's First Amendment rights?*

While the plaintiff may have no "right" to receive funding, a line of cases has made clear that there are some reasons on which the government may not deny benefits.

It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460] (1958). Such interference with constitutional rights is impermissible.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

An analysis of First Amendment rights must always be applied "in light of the special characteristics of the ... environment." *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972) (quoting *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 24 L.Ed.2d 731 (1969)). The Supreme Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."

■ Plaintiff contends that through its practice of funding all groups meeting the criteria for "B" funds, the University has created a "forum" generally open to all groups meeting the established criteria. This concept has previously only been applied to various geographic locations where the government has attempted to regulate speech. *See Hague v. C.I.O.,* 307 U.S. 496,

59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Avoiding the use of the forum concept, it would seem that once guidelines have been established for the funding, these could only be applied in a "content neutral" manner. (See Plaintiff's Ex. 2 for the procedure for applying for "B" funds and the actions taken by the finance committee.) To justify a content based exclusion the government must show that its regulation is necessary to a compelling state interest. *Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981).

To a certain extent courts have recognized that funding decisions must necessarily rest on the "subject matter" of the request. The Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 92, 96 S.Ct. 612, 669, 46 L.Ed.2d 659 (1976), discussed the aim of public funding of the arts and stated that "public funding of the arts seeks 'not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge' artistic expression." *Advocates for Arts v. Thomson,* 532 F.2d 792, 795 (1st Cir.1976) (quoting *Buckley v. Valeo, supra* ). Therefore, a decision can to a certain extent rest on intrinsic matters or the "value" of the subject matter itself. However, as the court noted,

> distribution of art grants on the basis of such extrinsic considerations as the applicants' political views, associations, or activities would violate the equal protection clause, if not the first amendment, by penalizing the exercise of those freedoms.

*Advocates, supra,* at 798 n. 8.

The question, then, is whether the University through the student senate merely refused to fund GLSA because it believed it was not educational or beneficial to the campus, or whether the University unduly interfered with GLSA's right to association or free speech for "content based" discriminatory reasons. The funding decisions, at least in the abortion area, hold that the mere withholding of funding does not infringe First Amendment rights. *See Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (upholding a state regulation prohibiting use of state funds for abortion related services); *Planned Parenthood of C. & N. Ariz. v. State of Arizona,* 718 F.2d 938 (9th Cir.1983) (state may not unreasonably interfere in the right to "engage in abortion or abortion-related speech activities, but the State need not support, monetarily or otherwise, those activities." *Id.* at 944). These cases rely on the Supreme Court precedent set out in *Maher, supra.* Based on similar reasoning, the fourth circuit in *MaryPIRG, supra,* upheld a limitation on funding, on the grounds that the University had no affirmative duty to activate the plaintiff's First Amendment rights. To a certain extent the same line of reasoning has resulted in a line of cases establishing the proposition that an individual, at least in certain contexts, cannot be compelled to contribute to an organization which holds and promotes ideological causes they oppose. *See Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (right to prevent union from spending fees on contributions to political candidates); *Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (right to reject state measures forcing an individual "as part of his daily life" to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable); *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (forced payment of "shop fees" used for purposes unrelated to collective bargaining); *Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (recognizing an individual's right to refuse on religious grounds to salute the flag); *Galda v. Rutgers,* 772 F.2d 1060 (3d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1375, 89 L.Ed.2d 602 (holding the assessment by a university of a mandatory fee to fund an independent organization, whose views were in opposition to that of some of the students, infringed on the students' First Amendment rights).

▪ Plaintiff contends the refusal to fund was based on impermissible extrinsic factors and not merely on an evaluation of

the "educational" value of the programs. In fact, plaintiff asserts that an evaluation of educational worth is not even one of the criteria used by the student senate in determining whether to grant funding. According to the testimony of Betsy Crow, the finance committee evaluates proper applications based on three factors: (1) the organization must be educational; (2) the organization must benefit the entire campus; and (3) the organization must meet all requirements in the code and the constitution. These criteria, however do not appear in the constitution or code.

GLSA had previously received recognition which gave them limited use of the school facilities, access to student advertising, use of campus bulletin boards, and the right to apply for "B" funds. The student senate has discretion whether to accept the recommendations of the finance committee as to which groups should be funded. Funding is approved through a democratic process and the ultimate decision is based on the vote of the student senate. In such a process a certain amount of discretion and subjective consideration is essential. Undoubtedly, the denial of funding to any group will have an impact, but it will not prevent the organization from advocating its views. To date there has not developed any firm policy concerning the constitutional value in sexual preference nondiscrimination. The University did not infringe upon GLSA's right of free speech or right of free association, but merely refused to affirmatively aid these rights through funding.

## IV. Equal Protection

Plaintiff also asserts that the University through its rules and policies giving the ASG absolute discretion as to funding violated the Equal Protection Clause of the Fourteenth Amendment. The plaintiff contends that this discretion is exercised in such a way as to classify GLSA differently than other student groups who are seeking funding. According to GLSA, this classification is made on the basis that the members of the group are homosexual and results in a disparate treatment of GLSA under the funding procedures as currently operated. As evidence of disparate treatment, GLSA members testified that they were required to stringently comply with the criteria for "B" funds including having a prior fundraiser, when this was not required of other groups; the denial of funding when all other student organizations meeting the written criteria for "B" funds were funded (*see* Plaintiff's Ex. 6, all other groups apparently funded unless they failed to meet the criteria or withdrew their application); and the suggestion of Lyle Gohn that GLSA lobby for funds.

■ Under the Equal Protection Clause, strict scrutiny applies when the plaintiff establishes that the rule "operates to the disadvantage of some suspect class or infringes upon a fundamental right explicitly or implicitly protected by the [United States] Constitution." *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). An intermediate level of scrutiny has been applied in cases involving gender-based classifications. Plaintiff invites the court to exercise strict scrutiny. Traditionally, the suspect classification has been limited to those discriminated against because they were a discrete and insular minority or were rendered politically powerless by discrimination. Although it has been frequently advanced in the last several decades, homosexuals have not been determined to be a suspect class. For presentation of the "suspectness" of homosexuals see: *Gay Law Students Ass'n v. Pacific Tel. & Tel.*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979) (finding that the Equal Protection Clause in the California Constitution forbids discrimination against homosexuals); L. Tribe, *American Constitutional Law* at 944 (1978); Barrett, *Legal Homophobia and the Christian Church*, 30 Hasting L.J. 1019 (1979); Comment, *Constitutionality of Laws Forbidding Private Homosexual Conduct*, 72 Mich.L. Rev. 1613 (1974); Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexuals in the United States*, 30 Hasting L.Rev. 799 (1979); Wilkinson & White, *Constitutional Protection for Personal Lifestyles*, 62 Cornell L.Rev. 563 (1977).

Indeed, a recent Supreme Court case upholding the constitutionality of sodomy laws lends support to the idea that homosexuality is not a suspect class. *Bowers v. Hardwick,* — U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

Strict scrutiny is also invoked when a fundamental right has been infringed. Plaintiff contends that its First Amendment right of free speech and the right of association are being infringed. To fall within the Equal Protection Clause plaintiff alleges that, although the constitution and the policies of the University do not set up classifications, the funding procedures are applied in such a way as to discriminate against homosexuals. Under the Equal Protection Clause an obligation is imposed to treat similar groups similarly. Therefore, a violation of the Equal Protection Clause would exist if GLSA was treated differently in the funding process than other student organizations and strict scrutiny would apply if such treatment infringed a fundamental right.

Much of the discussion above concerning content based discrimination applies in this context as well since the alleged violation of Equal Protection is based on First Amendment rights. As the court noted in *Advocates for Arts, supra,* "distribution of art grants on the bases of such extrinsic considerations as the applicant's political views, associations, or activities would violate the equal protection clause, if not the first amendment, by penalizing the exercise of those freedoms." *Advocates for Arts v. Thomson,* 532 F.2d 792, 798 n. 8 (1st Cir. 1976). As noted in the defendants' post trial brief, the Supreme Court has in the past upheld providing funding to certain groups and not to others. In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court upheld a provision that provides federal funds to certain candidates who meet the criteria of the Federal Election Campaign Act of 1971. The Court reasoned that the denial did not in-

fringe constitutionally protected rights, but merely operated to enhance the rights of those receiving funds. Naturally, the granting of funds to GLSA would have given GLSA the means with which to carry out special projects, but the crux of the question is did the denial or the reasons for the denial impermissibly infringe on GLSA's First Amendment rights. As this court concluded above, the denial did not infringe GLSA's rights but merely represented a decision by the senate not to affirmatively aid GLSA.

■ Absent a suspect class or a fundamental right, or a gender-based classification triggering intermediate scrutiny, a rational basis standard applies. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Under this test, discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Here we are concerned with the discretion given the governing body of the student government.[10] The distribution of the activity fees is left in the hands of students who are elected as representatives of the campus. Clearly, the University and the student government have a legitimate interest in distributing the limited pool of funds in a manner that is beneficial to the campus as a whole. Participation in the student government brings with it the responsibility to exercise their vote in such a manner as to advance the interests of the general student population. This decision necessarily involves a certain amount of discretion. The regulations and criteria set up concerning eligibility for "B" funds provides the student senate with a pool of applicants from which to disperse the available money as they believe is in the best interests of the student population. There is no guarantee that a given group will be funded or, if funded, that they will receive the full amount of their request. The ultimate decision is in the hands of those elect-

---

10. The court, over objection of defendants, allowed evidence concerning the "HRC incident" since this was relevant to establishing the "atmosphere" on the campus regarding homosexuals. However, evidence did not show that this refusal of then Chancellor Willard Gatewood to fund the workshop if it contained a segment on stereotyping of homosexuals was connected in any way to the decision of the student senate in denying funds to GLSA. *See supra,* note 9.

ed by the general population of the University.

For the reasons set forth above, the court finds that in the particular situation presented by this litigation, the denial of funding did not violate the First and/or Fourteenth Amendments. Therefore, the plaintiff is entitled to no relief on its complaint.

A separate order in accord with this memorandum opinion will be concurrently entered.