**GAY AND LESBIAN STUDENTS ASSO-CIATION, an Unincorporated Association, Appellee,**

v.

**Lyle GOHN, Individually and in his Official Capacity as Vice–Chancellor for Student Services at The University of Arkansas, Fayetteville; Hugh B. Chalmers; Jack L. Williams; Hall McAdams; Kaneaster Hodges; Gus Blass; Morris Andrew Jackson; W. Sykes Harris, Sr.; W. Maurice Smith, Jr.; Jim Blair; and Sandy Ledbetter, in their Official Capacities as Members of the Board of Trustees of the University of Arkansas, Appellants.**

**GAY AND LESBIAN STUDENTS ASSO-CIATION, an Unincorporated Association, Appellant,**

v.

**Lyle GOHN, Individually and in his Official Capacity as Vice–Chancellor for Student Services at The University of Arkansas, Fayetteville; Hugh B. Chalmers; Jack L. Williams; Hall McAdams; Kaneaster Hodges; Gus Blass; Morris Andrew Jackson; W. Sykes Harris, Sr.; W. Maurice Smith, Jr.; Jim Blair; and Sandy Ledbetter, in their Official Capacities as Members of the Board of Trustees of the University of Arkansas, Appellees.**

Nos. 87–1486, 87–1569.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1988.

Decided June 22, 1988.

Rehearing and Rehearing En Banc Denied Aug. 18, 1988.

Nan D. Hunter, New York City, for GLSA.

Fred H. Harrison, Little Rock, Ark., for Gohn et al.

Before LAY, Chief Judge, and McMILLIAN and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

The Gay and Lesbian Students Association of the University of Arkansas at Fayetteville brought this § 1983 action after its funding request was denied by the Student Senate. The GLSA alleged that it was denied funds because of the content of its message, in violation of the First Amendment. The District Court ruled that while the case was not moot, and state action was present, the GLSA's First Amendment right of free speech was not violated by the Senate's action. 656 F.Supp. 1045. The GLSA now appeals the Court's decision on the speech issue, and the University appeals its rulings on mootness and state action.[1] We hold for the GLSA on all three questions.

In brief, we hold that a public body that chooses to fund speech or expression must do so even-handedly, without discriminating among recipients on the basis of their ideology. The University need not supply funds to student organizations; but once having decided to do so, it is bound by the First Amendment to act without regard to the content of the ideas being expressed. This will mean, to use Holmes's phrase, that the taxpayers will occasionally be obligated to support not only the thought of which they approve, but also the thought that they hate. That is one of the fundamental premises of American law.

I.

The University of Arkansas is a publicly funded university governed by a Board of Trustees.[2] Student government is carried out through an organization called the Associated Student Government (ASG), which was created by a constitution adopted by the Board of Trustees in 1943. Under this constitution the Student Senate, the legislative branch of the ASG, has been delegated the function of appropriating money from student service funds to student organizations, subject to administrative approval. These funds come from tuition, state tax money, and general fees collected from students.

The GLSA has been a registered student organization on the Fayetteville campus of the University since 1983. Its stated purpose then and now is to educate people about homosexuality and to provide a support group for homosexuals. The group's typical activities include sponsoring workshops, films, and panel discussions on homosexuality. As a registered student organization, the GLSA is entitled to certain benefits, such as using University facilities for its meetings and projects, and being listed in University publications.

Registered student organizations also have the right to petition the Student Senate for University funds. A group may apply for "A" funds to supply large, ongoing enterprises like the school newspaper, or "B" funds to support special needs or projects. "B" funds are often granted for speech-related purposes. For example, Amnesty International used "B" funds to sponsor films, and the Nuclear Awareness Group used them to bring in a speaker. The denial of "B" funds is at issue in this case.

1. The University prevailed below. The District Court rejected GLSA's First Amendment claim on its merits and dismissed the complaint. As the winning party, the University can urge in this Court any ground that supports the judgment of dismissal, including grounds, like mootness and lack of state action, on which it did not succeed in the District Court. It was not necessary to file a notice of cross-appeal in order to present these arguments, although we can understand why cautious lawyers would choose to do so.

2. See generally Ark.Code Ann. § 6–64–203 (1987).

To receive "B" funds, a student group must first submit an application to the Finance Committee of the Student Senate. The Committee reviews the application, checking to see whether the group complies with the criteria laid out in the constitution. If one of these technical requirements[3] is not met, the group's request is rejected, usually with an explanation attached. After this initial objective evaluation, the Committee then determines whether the group's planned events would be educational and would benefit the entire community.[4] Besides accepting or rejecting the funding requests, the Finance Committee may also modify them. For example, the Committee may strike from the application requests for office supplies, or change the estimate of the cost of obtaining a film. The Committee delivers its recommendations to the Senate, which then votes on them. Though time is set aside at the Senate meeting to discuss and debate the funding requests, receiving a recommendation from the Finance Committee has historically been tantamount to being funded.

The GLSA first applied for "B" funds in January of 1983 in order to present two films and hold a panel discussion. The Finance Committee recommended it receive $136.00. Senate debate on the measure was described as "heated." Transcript at 107. One Senator argued, "The key word is 'support.' ... This is a group that supports gay and lesbian homosexuality. We cannot use state money to support a homosexual group. What if a group of students/arsonists wanted to start an arsonists club and start fires. Would you fund them? ... It's the same thing as funding homosexuals." Gohn Dep. Exhibit 15. However, another remarked, "Why is it that this group is being subjected to a review ... [when] [o]ther groups on campus who request funding are not treated

like this." *Id.* The proposal was defeated by a vote of 35 to 17.

The GLSA appealed to Lyle Gohn, Vice Chancellor for Student Services and the official charged with oversight of student organizations. Gohn denied relief, stating "I would hope that you ... would accept the decision of your fellow student senators." Plaintiff's Exhibit 30. He disavowed knowledge of why the Senate voted the way it did.[5] The GLSA next appealed to then-Chancellor B.A. Nugent. He claimed to "have no evidence that discrimination was present among those who voted against funding," and that "[d]etermining the motives or rationale of the individual student senators ... has no relevancy." Plaintiff's Exhibit 33. He believed that the Senate made its choice on purely fiscal considerations.[6] Finally, the GLSA took its case to the Vice President for Academic Affairs, Charles Oxford. He too denied the appeal, finding no "procedural error." Plaintiff's Exhibit 34.

During this same period of time, the Arkansas State Legislature was in session. Representative Travis Dowd of Texarkana introduced two resolutions dealing with state universities and homosexuals. The first, House Resolution 16, urged the University "to refrain from assisting in any manner the gay community on campus." The second, House Resolution 25, went further, urging University officials "not only [to] refrain from assisting in any manner whatsoever the homosexual community of their campuses, but to institute any and all lawful measures to stem the tide of homosexuality on the campuses of our colleges and universities." Plaintiff's Exhibit 31. Both resolutions were narrowly defeated in committee. Gohn was aware of the resolutions, and kept copies of them in the same file where he stored his correspondence with the GLSA. Transcript at 105.

---

**3.** Technical requirements include holding a fundraiser before asking for University funds and setting forth in detail the organization's planned activities. In addition, some events, such as beauty pageants, can never be funded with University money.

**4.** GLSA contends this second test was added in order to block its receipt of funds.

**5.** We note, however, that Gohn attended all Senate meetings, including this one.

**6.** But in his letter to the GLSA Nugent also noted that some "B" funds were left over that year.

In the fall of 1984 the GLSA again applied for "B" funds and secured the approval of the Finance Committee. However, the procedure the Committee followed in submitting funding recommendations to the Senate was different that year. Funding requests were put before the Senate in packages, so that three or four were voted on at a time. Thus, the GLSA's application was presented along with several others. Various Senators did attempt to separate out the GLSA's request. However, despite what was described as a "horrible," "emotional," and "vulgar" debate, these parliamentary maneuvers failed, and the GLSA received $70.00 that fall. Transcript at 38, 48.

Campus reaction to the GLSA's receipt of $70.00 was swift and severe. The Student Senate passed a rule prohibiting the funding of any group organized around sexual preference.[7] The measure was vetoed by the ASG president, who called it discriminatory, and analogized it to seemingly reasonable laws once used to disenfranchise blacks. Plaintiff's Exhibit 24. She was particularly appalled that such an attitude would be found at a university, "traditionally [a] place[ ] of open-mindedness and growth." Id.

Events on campus did not escape the notice of University officials or state legislators. In June of 1985 University officials, including the President and two members of the Board of Trustees, met with a dozen state representatives and senators in Fayetteville. It appears that the funding of the GLSA was discussed, and that all present were concerned about the adverse publicity that funding the GLSA had brought to the University.

Later in June of 1985, Chancellor Willard Gatewood attended a meeting about the University's Staff Development Program. Discussion centered on a series of workshops on stereotyping and prejudice to be held in the fall. The workshops, designed around seven vignettes, were to be held for University faculty and staff. One of the scenarios was about homosexuality. Gatewood told members of the group that no state money would go to the workshops as long as the segment on gays and lesbians was included. Plaintiff's Exhibit 48. Apparently, Gatewood insinuated that University support would be withdrawn as well. Plaintiff's Exhibit 49.

In the fall of 1985, the GLSA once more submitted an application for "B" funds. The group planned to show a historical documentary, "Before Stonewall," and sponsor two workshops, one on racism and one on homophobia. The GLSA initially requested $295.00, but after conferring with the Finance Committee trimmed its request to $165.00. The Finance Committee found the GLSA met all the funding criteria, and recommended that it receive "B" funds.

The student chairman of the Committee, though confident the GLSA deserved funding, was apprehensive about presenting the Committee's recommendation to the Senate. Fearing a repeat of the events from the year before, Transcript at 35, she sought Gohn's advice. He told her to handle it as best she could. She decided to present the funding requests individually, as had been done before 1984.

After some initial confusion,[8] the GLSA representative made a short speech on why the group should be funded. The GLSA was the only organization which made such a presentation. When the group's representative stood up, one senator expressed surprise at how normal she looked. Transcript at 50. Debate on the measure was brief; students argued that funding the GLSA would be illegal or contrary to religious beliefs. Transcript at 34. The GLSA was denied funds by a 34 to 21 vote.

The GLSA was the only group recommended by the Finance Committee that was not funded. The Finance Committee chairman believed it was the first time a recommended group had been denied mon-

---

7. GLSA was the only such group.

8. Apparently the student conducting the meeting was unaware the GLSA wanted to speak before the vote was taken. Groups had always had the chance to make brief presentations before the Senate vote, but seldom took advantage of it.

ey. Indeed, three groups who did not receive the Finance Committee's recommendation received "B" funds, and money was still left over at the end of the year.

The GLSA appealed to Vice Chancellor Gohn. Gohn conceded that the GLSA had met all technical requirements, while other groups which had not were nevertheless given funds, but denied the appeal, arguing that the decision of the Student Senate should be respected. Plaintiff's Exhibit 12. Though in his letter to the GLSA Gohn claimed not to know why the Senate voted as it did, he later seemed to admit the GLSA had been discriminated against. Transcript at 41–42. The GLSA then appealed to Chancellor Ferritor, who upheld Gohn's decision in a brief statement. Finally, the GLSA wrote to the President for help. He too denied relief, stating first that he lacked jurisdiction to reverse funding decisions, as that was within the province of the Vice Chancellor, and second that in any case he agreed with Gohn's analysis. Plaintiff's Exhibit 18.

The GLSA then brought this lawsuit, alleging its First Amendment rights were violated when it was denied "B" funds because of the content of its speech. Before we reach this question, we must deal with two preliminary issues.

## II.

■ The District Court held that this case involves a live controversy, since the funding denial was an issue capable of repetition yet evading review. The University contests this conclusion, arguing that the problem might not recur, and, if it did, there would be ample time to seek judicial review. In support of its first contention, the University notes that the composition of the Student Senate has changed since 1985; senators have graduated or retired. It is possible that a subsequent Senate would vote to fund the GLSA. After all, a Senate did so in 1984. The University

claims no one can accurately predict the vagaries of student government.

We observe first that the funding cycle for student organizations is one year. That is too short a period for the GLSA to appeal to the proper University officials and then fully litigate its claim. Second, we note that it need not be proved with certainty that the situation will recur; GLSA must show only a reasonable expectation of repetition. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975) (per curiam). The District Court laid out a litany of facts that point to a probable recurrence: University officials continue to support the Senate's denials of funding; the Senate has a policy of granting funds to all organizations who meet the requirements, yet has denied funding to a properly qualified GLSA on two occasions; and the one time the GLSA received funds, the Senate tried to enact a proposal that would prevent it from ever again receiving funds. *Gay & Lesbian Students Assoc. v. Gohn*, 656 F.Supp. 1045, 1051 (W.D.Ark.1987). The case is not moot.[9]

## III.

■ The University contests the District Court's determination that state action was present in the denial of funding to the GLSA. Conceding that the University and through it the Student Senate are creations of the State, and that "B" funds originate in state coffers, the appellees nonetheless contend that because University officials had no control over the Student Senate, state action was not present. The University relies on *Sinn v. The Daily Nebraskan*, 829 F.2d 662 (8th Cir.1987), a case in which state action was held to be lacking where a university exercised no editorial control over a student newspaper.

However, a review of the facts in this case demonstrates that the University did have final say over Senate funding decisions. The student handbook, which dis-

---

**9.** The GLSA contends that the University is precluded from raising this issue before us, since it failed to declare its intent to appeal mootness in its Notice of Cross Appeal. We disagree. Because mootness goes to the Article III requirement of a case or controversy, the issue could have been raised at any time, or even by this Court *sua sponte*.

cusses, among other things, how University funds are allocated, states that "[d]ecisions concerning financing of student organizations may be appealed to the Vice Chancellor for Student Services." Plaintiff's Exhibit 1 at 20. The District Court found this meant the Vice Chancellor had "the final say as to funding decisions through his power to hear appeals." 656 F.Supp. at 1053. On appeal, the University questions this interpretation of the student handbook, arguing that this provision applies only to "A" funds. However, both times the GLSA appealed to the Vice Chancellor, he acted as though he had the power to reverse the Student Senate. Only the University President asserted a lack of jurisdiction, and in doing so, he stated that the Vice Chancellor could entertain this kind of appeal. Plaintiff's Exhibit 18. Thus, unlike the newspaper in *Sinn*, the Student Senate here was not free from University control. State action was present in the funding decision.

## IV.

The GLSA appeals the District Court's holding that the Student Senate's denial of funding to the group did not violate its First Amendment rights. Because we believe the record is replete with evidence that the Senate's action was based on viewpoint discrimination, we reverse.

■The District Court aptly concluded that the GLSA had no right to receive "B" funds. First, the Court observed that while student organizations have the right to university recognition and to use of university facilities on a nondiscriminatory basis, see *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Gay Lib v. University of Missouri*, 558 F.2d 848 (8th Cir.1977) *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978), they have no clearly established right to receive university funds. See *Healy, supra*, 408 U.S. at 182 n. 8, 92 S.Ct. at 2346 n. 8. Second, the Court reasoned that since "B" funds are finite, student organizations logically could not have a right to receive them, at least not in whatever amounts

they may request. Resource constraints necessarily impose some limit.

■ The District Court went on to recognize that, while the GLSA has no right to receive "B" funds, it may not be denied them for a reason which violates its First Amendment rights:

[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). Such interference with constitutional rights is impermissible.

656 F.Supp. at 1054, quoting *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). Content-based discrimination can be justified only if the government demonstrates that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest. *Widmar v. Vincent*, 454 U.S. 263, 270, 102 S.Ct. 269, 274–75, 70 L.Ed.2d 440 (1981). This is an extremely difficult standard for government to meet.

■ We agree with the District Court's enunciation of these two basic premises: that a group has no right to funding, but when funds are made available, they must be distributed in a viewpoint-neutral manner, absent other considerations. If these two principles had been applied to the facts in this case, the GLSA would have prevailed, as will be shown. Obviously, the District Court's analysis did not stop after these two steps.

The District Court erred in overemphasizing the first proposition, that the GLSA has no right to funding. Noting that the GLSA had no right to have its speech subsidized, the Court cited *Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (*TWR*),

and *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959). In this pair of cases, the Supreme Court held that the state need not aid a taxpayer in exercising his First Amendment rights by granting him deductions for speech-related activities. But these cases dealt with content-neutral tax provisions. As Justice (as he then was) Rehnquist stated, "[t]he case would be different if Congress were to discriminate indiviously in its subsidies in such a way as to ' "ai[m] at the suppression of dangerous ideas".' " *TWR, supra,* at 548, 103 S.Ct. at 2002 (citations omitted).

The District Court also overstated the role legitimate discretion played in the Senate's funding decision. Relying on *Advocates for Arts v. Thomson,* 532 F.2d 792 (1st Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976), the Court stated that "a [funding] decision can to a certain extent rest on intrinsic matters or the 'value' of the subject matter itself." 656 F.Supp. at 1055. The Court went on to say that "[t]o date there has not developed any firm policy concerning the constitutional value in sexual preference nondiscrimination." *Id.* at 1056. Thus, the Court concluded, after weighing the merits of competing funding proposals, the Student Senate might choose not to fund the GLSA, concluding its message was less worthy than that of some other group. In its brief, the University argues along similar lines, claiming that the Senate may have chosen not to fund the group because it was not so educational and beneficial to the campus as other groups.

*Advocates for Arts,* however, dealt with state grants for literary magazines. The competition for funds was judged on artistic, not political or ideological grounds. The First Circuit recognized this distinction, noting that "distribution of arts grants on the basis of such extrinsic considerations as the applicants' political views, associations, or activities would violate the equal protection clause, if not the first amendment, by penalizing the exercise of those freedoms." 532 F.2d at 798 n. 8. What is at issue here is not the value of a short story or the constitutional status of sexual preferences, but speech on the subject of nondiscrimination.

The University claims the denial of funding was for a number of valid reasons related to the educational merit and benefit to the community of the GLSA's planned activities. But these reasons were not mentioned in the course of the denial of funds. Indeed, there is evidence that many senators voted against funding for other reasons, such as their disagreement with the GLSA's beliefs. In response to this, the University argues that the motive of the Student Senate is irrelevant, and in any case cannot be determined, since each senator may have a different rationale. Every claim of viewpoint discrimination requires, by its very nature, that the purposes or motives of governmental officials be determined. When the body involved has many members, the question is harder to answer, but it still must be faced. See *Edwards v. Aguillard,* —— U.S. ——, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

When the original two premises are applied to the facts in this case, the First Amendment violation is apparent. The GLSA met all objective criteria for funding and received the Finance Committee's recommendation, yet was denied funds twice. The one time the GLSA received funds, an unusual procedure was followed in presenting requests before the Senate. And, immediately after the granting of funds, the Senate voted never to fund the GLSA again. All other qualified groups received money. There was no shortage of resources, since unqualified organizations were given funds, and money was left over at the end of the appropriations period. Some student senators freely admitted they voted against the group because of its views. University officials were feeling pressure from state legislators not to fund the GLSA or to allow in any way the dissemination of opinions tolerant towards homosexuals. It is apparent that the GLSA was denied "B" funds because of the views it espoused. Nor is there a compelling state interest justifying the Senate's denial of funds. The University provides no argu-

ment, and we can think of none. True, sodomy is illegal in Arkansas. However, the GLSA does not advocate sodomy, and, even if it did, its speech about an illegal activity would still be protected by the First Amendment. People may extol the virtues of arson or even cannibalism. They simply may not commit the acts. Thus, we reverse the District Court on the First Amendment issue. Conduct may be prohibited or regulated, within broad limits. But government may not discriminate against people because it dislikes their ideas, not even when the ideas include advocating that certain conduct now criminal be legalized.

We realize that the District Court made no explicit finding as to the reason for denial of funding, that this is a question of fact, and that appellate courts are not fact-finding forums. We think, though, that the District Court's opinion, when read in full and in context, includes an implicit finding that funds were denied because of distaste for the GLSA's ideas. Otherwise, there would have been no need to resort to the legal doctrines (*e.g.*, that there is no "right" to public money) used by the Court to justify dismissing the complaint. A finding of fact that funds were denied for some content-neutral reason would have sufficed completely to dispose of the case. In any event, the facts of this case are so obvious that a remand for an explicit finding would be a waste of time. This record leaves no reasonable doubt that funds were denied because of disagreement with the GLSA's speech. A finding the other way would be clearly erroneous.

Because we hold the appellant's First Amendment rights were violated when the Senate refused to grant it "B" funds, we find it unnecessary to reach its due-process argument.

The judgment of the District Court is reversed, and the case is remanded with directions to provide the appellant with appropriate relief in accordance with this opinion.